LOCAL NO. 1 (ACA), BROADCAST EMPLOYEES OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, William Bender, Morton Borrow, Walter Jost and Anthony Evasew

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Frank E. Fitzsimmons, General President, Edward Nangle, Vice President, Highway Truck Drivers and Helpers Local 107, Louis J. Bottone, President, Local 107, and John E. Smalley.

Civ. A. No. 75–2684.

United States District Court,
E. D. Pennsylvania.

Nov. 8, 1978.

As Amended Dec. 14, 1978.

Harry Lore, Philadelphia, Pa., for plaintiffs.

Barry W. Levine, Washington, D. C., John F. Dougherty, Jr., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

In July 1975, Local 1 (ACA), a small local union affiliated with the International Brotherhood of Teamsters (IBT) was ordered by the IBT's General Executive Board (GEB) to be merged into Highway Truck Drivers and Helpers Local 107, a large local union. Under the terms of the merger order, Local 107 was the sole surviving entity. Alleging violation of rights protected under 42 U.S.C. § 1985, 29 U.S.C. § 101 *et seq.*, state law, and the IBT Constitution, Local 1 and its officers brought this action seeking declaratory and injunctive relief against the merger.

The first phase of this litigation dealt with plaintiffs' motion for a preliminary injunction. In an earlier opinion, 419 F.Supp. 263 (E.D.Pa.1976), we denied that motion. Plaintiffs' prayer for declaratory and injunctive relief against the merger is now before us on final hearing, though on the same record as in the earlier phase, because the parties have not supplemented it. Since our earlier opinion contains extensive findings of fact and conclusions of law, we may finalize any decision on the declaratory and injunctive issues with only the briefest of discussion. Reaffirming our earlier findings and conclusions, we decide that plaintiffs have not proved that the IBT merger order of July, 1975 violated any rights of plaintiffs protected under 42 U.S.C. § 1985, 29 U.S.C. § 101 *et seq.*, state law, or the IBT constitution. Accordingly, we shall grant to defendants declaratory and injunctive relief, declaring that the merger is valid and lawful, and ordering Local 1 to turn over various union property under its control.

The principal purpose of this opinion is to address a claim by plaintiff William Bender, Secretary-Treasurer, Business Agent, and Chief Executive officer of Local 1 for salary for work for Local 1 both prior to and after the merger order. Bender asserts this claim against both Local 107 and the IBT. The salary claim relates mainly to Bender's work for Local 1 from 1972 until the merger order in July, 1975, during which time he was paid virtually no compensation, because of the extremely small size and financial weakness of Local 1. Bender worked full time during that period. While part of his time was spent in servicing the existing membership, most of it was devoted to efforts to broaden Local 1's membership base and increase its members by various organizing campaigns, or in efforts to retain those members obtained in casualty insur-

ance industry organization drives when their Local 1 affiliation was under attack before the NLRB and in the Courts. Local 1's assets during most of the period from 1972–1975 were two thousand dollars or less. In 1974 and again in 1975 Local 1's Executive Board voted Bender a salary covering the period 1972–75, contingent on the local acquiring funds sufficient to pay it. The merger order in July, 1975 extinguished any possibility that Local 1 *qua* Local 1 would ever come to have sufficient resources to pay Bender any back salary.

Local 107 and the IBT have interposed a great number of defenses to the salary claim, most of them relating to procedural irregularities on the part of Local 1's Executive Board, which, in their view, render the resolutions to pay Bender past and future salary void *ab initio.* *Inter alia,* defendants assert that the Executive Board's actions were invalid for the following reasons: (1) the Executive Board's failure to enact by-laws and otherwise follow the IBT constitution; (2) the failure of Local 1's general membership to ratify the salary resolutions; (3) the resolutions constituted a breach of the Executive Board members' fiduciary duty under the IBT Constitution; (4) the resolutions violated the Labor-Management Reporting Disclosure Act, 29 U.S.C. § 431(b) and (c) (LMRDA); (5) the resolutions were fraudulent, *i. e.* made in anticipation of the merger, hence to bind the successor local or the IBT; (6) the "when and if" condition precedent to the salary resolutions has never come to pass because Local 1 went out of existence and therefore never obtained sufficient funds, and because Local 107 does not have sufficient funds; and (7) the IBT Constitution shields the IBT from liability.

■ As will at length appear, we reject every defense except the one, founded upon the IBT Constitution, which absolves the

International from liability by virtue of a merger order, and decide that under Pennsylvania law, which we follow on this pendent claim, the contingent salary obligation created by Local 1's Executive Board was valid, and was transferred by virtue of the merger to become a contingent liability of the successor organization, Local 107. Finding that the contingency has been discharged—i. e. that Local 107 has funds sufficient to pay the back salary—we conclude the pre-merger order salary is an obligation upon Local 107 now due and owing. However, because *following* the merger of July, 1975, Bender acted purely as a volunteer (he was not hired by successor Local 107), there is no basis for any salary claim for his post-merger services, and that claim will be denied.

This opinion constitutes our findings of fact and conclusions of law under Fed.R. Civ.P. 52(a).[1]

## II. *Bender's Salary Claims*
### A. *Findings of Fact*

**1. *Plaintiff Bender's work for Local 1***

We made extensive findings of fact about Mr. Bender in our earlier opinion. We now ratify and incorporate the factual findings relevant to him from that opinion.[2] By way of brief recapitulation, we note the following.

In 1946, Bender became affiliated with the American Communications Association (ACA), a labor organization composed of Local Unions representing employees in the then thriving broadcast industry. Bender is a bright and articulate man with talent for labor organizing. In 1966, in the wake of the mechanization of the broadcast industry and the corresponding decline in the number of workers employed by radio stations, hence of union membership, the ACA and

---

1. This opinion concerns the claims of plaintiffs only against defendant IBT and Local 107. The remaining defendants were dismissed as parties early in the proceedings.

2. Indeed, it is necessary to incorporate all of the findings contained in our earlier opinion, since the issues involved there are also before

us on final hearing, hence we do so. While incorporation may be less satisfactory than formal rescription, it is also less time consuming. We shall, however, where helpful to the present discussion, restate discrete earlier findings.

its constituent local unions, including Local 1, became affiliated with the IBT. Following affiliation, Bender worked for a year (1967) directly for the IBT as a General Organizer at an annual salary of $20,000. For the next three years he worked as a paid organizer for the ACA Division of the IBT.

In May, 1971, Bender was elected Secretary-Treasurer, and member of the Executive Board of Local 1. Most of Local 1's members were employees of radio stations in New York and Philadelphia. He subsequently assumed the duties of business agent and principal executive officer of the local, which meant he had primary responsibility for servicing the needs of the existing members of the local (handling grievances, negotiating collective bargaining agreements, etc.) and for union organization. The latter was an important duty in view of the large decline in Local 1's membership. Bender took the initiative by seeking to organize in the insurance industry, which was essentially virgin territory for the union movement, as well as in other non-broadcast industries. As our earlier opinion demonstrates, Bender's efforts were unsuccessful and, because of its small size (40 to 115 members during 1972–74, see 419 F.Supp. at 278) and concomitant inability to support its activities financially, the IBT ultimately, and over the objection of both locals, decided to merge Local 1 into Local 107.[3] During Bender's stewardship of Local 1, he was also involved in IBT politics, becoming a partisan for the return to power of James R. Hoffa. We turn now from recapitulation to the making of new findings germane to the issues before us.

From May to December 1971, Local 1 paid Bender a salary of $200 per week. He was the only salaried official of the Local. Bender's salary ceased, however, on January 1, 1972, because of the lack of assets in Local 1's treasury. The relevant financial statement shows that the union began the year 1971 with $8,800 in cash. By December 31, 1971, the balance was $407.40. Local 1 was never again in a financial position to pay Bender (or any other officer) a salary over any continuous period of time.

Bender continued to work as Secretary-Treasurer, business agent and principal executive officer for Local 1 during the years 1972, 1973, and 1974, without compensation, supporting himself from savings and from his wife's earnings. His hope during those years was to vastly increase the membership of the local by making a breakthrough in the casualty insurance industry. Bender had already had some success in organizing insurance adjusters. He therefore undertook drives to organize more insurance adjusters, and also greeting card workers, newspaper circulation managers and radio technicians. At one point he obtained signature cards from 1500 radio technicians at NBC and ABC. At another point he made substantial progress in organizing 700 greeting card workers at the Norcross plant in West Chester, Pennsylvania. For various reasons these efforts did not achieve fruition in the form of Local 1 membership. Many hundreds of casualty insurance industry employees were the object of various Bender organizational drives, with certification achieved for various periods of time at several large insurance companies. But Bender's insurance industry initiative was fraught with litigation before the NLRB and the courts, and was ultimately scuttled because of lack of IBT financial support. The greatest increase in Local 1's membership during these years occurred in June, 1975, one month before the IBT ordered Local 1 merged with Local 107, when the membership jumped from 61 to 115 (419 F.Supp. at 278).

We find that during the years 1972, 1973, and 1974, and through July, 1975, Bender worked over forty hours a week, five or more days a week, 52 weeks a year, at his union responsibilities. We further find that 100% of his activities were directly on behalf of Local 1. In other words, although

---

**3.** Local 107 is a large local headquartered in Philadelphia, most of whose members are truck drivers.

his organization of a number of new workers would have indirectly inured to the benefit of the IBT, its Eastern Conference and its appropriate Joint Council through payment of additional per capita sums by Local 1 to those organizations under the IBT charter, Bender was working not for any of those organizations but rather full-time for Local 1.

## 2. *Local 1's Executive Board—Its Structure, Function, and Compliance with the IBT Constitution*

In our earlier opinion, we made certain factual findings which are a necessary point of embarkation for our factual findings herein:

Local 1's shortcomings have not been only financial. The local has also suffered from a bifurcation of its internal operations, a tale of two cities, as it were. For, while the local's office is in Philadelphia, most of its members, including Bender, live and work in metropolitan New York. Local 1 has failed to hold monthly membership meetings as required by the IBT Constitution Art. XIV, § 2(a)(1), probably for that reason, and its executive board meetings were held in a strange way: two members would meet in Philadelphia one day and three in New York the next (with Bender). Moreover, an audit report prepared for the IBT showed, *inter alia*, that Local 1 failed to adopt bylaws, as required by the IBT Constitution, Art. XXII, § 1, and that the local was late in paying per capita sums due the IBT, the Eastern Conference, and the Joint Council, and in filing required trustee reports. These problems did not prevent Bender, a most dedicated man, from servicing the membership, and at no time has there been any complaint by members of Local 1 regarding servicing, negotiation of collective bargaining agreements, or the performance of duties by Bender. On the other hand, the local's viability is at best marginal, and, in view of its financial difficulties, it lacks the capacity effectively to organize its jurisdiction.

While we re-affirm these findings (except for amending the number of officers of the Executive Board from five to seven) we also need to supply additional facts which were not material to the legal questions presented in our earlier opinion, but which are material to the question whether Local 1 was in compliance with the IBT Constitution and whether the Executive Board acted within its powers in voting Bender a salary.

At the time Local 1 of the ACA sought to become IBT Local 1, seven members of Local 1 ACA signed a charter application. Those applicants were Bender, Morton Borrow, Charles F. McCracken, Sam Van Fossen, Frank Unterberger, Walter Jost, and Gordon Greenfield. In the application they pledged themselves to be governed by the IBT Constitution and all amendments thereto. Two weeks later, on November 15, 1966, Local 1 received its Charter from the IBT, with the above seven persons listed as Charter Members. The IBT Charter they were granted on behalf of Local 1 provided:

This Local Union shall be empowered to adopt Bylaws, negotiate contracts covering wages, hours, and conditions of employment in accordance with the laws, usages and requirements of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and in accordance with the best interests of the labor movements.

The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America grants this charter with the understanding that should the parties receiving it, or their successors, fail to comply with the provisions herein set forth, or with the Constitution, laws, usages and requirements of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, this charter will be revoked and they shall be required to turn over all books, documents, property and funds to the General President or his representative, or to the General Secretary-Treasurer of the International Union, and should Local Union No. 1 secede, disaffiliate, or dissolve, or be suspended, or forfeit its

charter, then all books, documents, property and funds shall likewise be turned over to the General President, or his representative, or to the General Secretary-Treasurer in accordance with the applicable provisions of the International Constitution.

The record is silent on the internal structure of Local 1 prior to 1971. In May, 1971, however, in the same general membership election in which Bender was elected Secretary-Treasurer, six other members were elected to the Executive Board. Charter members Borrow, Jost and McCracken were elected President, Vice-President and Recording Secretary, respectively; charter members Greenfield and Van Fossen were elected Trustees and non-charter member Myers was elected the third Trustee. Each of the seven positions was for a term of three years, until May, 1974. The provision of the IBT Constitution governing the composition of Local 1's Executive Board reads as follows:

ARTICLE XXII § 2

The officers of the Local Union shall consist of a President, Vice-President, Recording Secretary, Secretary-Treasurer and three (3) trustees. These officers shall constitute the Executive Board of the organization. . . .

Although in our earlier opinion we found Local 1's Executive Board to be composed of five members, we now amend that finding as follows: from May, 1971 to May, 1974, the officers of Local 1's Executive Board, elected by the general membership, were the seven named above. Following a general membership election in May, 1974, at least three, and possibly four (*i. e.* Bender, Morrow and Jost, with one being unidentified) were re-elected. Thus, notwithstanding defendants' intimation to the contrary, not only was Article XXII § 2 complied with, but the 3 year interval between elections required by Article XXII § 3 was complied with as well.

We also find that the bifurcated branches of the Executive Board referred to in our earlier opinion regularly met, though not within two days of each other, (as earlier found) but within approximately one week to ten days of each other, with Bender and two other members meeting in New York and Bender and four other members meeting in Philadelphia.

The duties of the individual members of the Executive Board, and of the Executive Board of a local itself, are specified in a number of articles of the IBT Constitution. One provision relevant to the IBT and Local 107's defense is Article VI § 4(b), which provides:

Local Unions shall not adopt bylaws or take any action which would impair their ability to meet their financial obligations to the International Union and its subordinate bodies or interfere with the discharge of their obligations to their members in the negotiation and administration of collective bargaining agreements and in conducting the affairs of the Local Union as a solvent organization.

Defendants have contended that this section was violated and that the action taken to confer a salary upon Bender was ultra vires. We find, however, that neither the Executive Board nor any of its officers between 1971 and July 1975 "took any action" which impaired their ability to meet any obligations to the ACA or IBT or any other organization, nor that was in derogation of their fiduciary duty to Local 1's membership.

The financial statements for these years show that the $9,000 cash balance present on December 31, 1969, was reduced to $8,700 a year later, and then dropped dramatically to $400 by the end of 1971 (owing largely to Bender's salary between May and December). The balance increased to $970 in December, 1972 but fell further to $200 by the end of 1974. While these are meager amounts by union standards, at no time did Local 1 go "into the red" or refuse to honor any of its financial obligations other than for Bender's salary. In most of these years it collected over $4,000 in dues, made per capita payments to the IBT and paid the sundry daily expenses associated with running a local union. While it is true, as

we found in our earlier opinion, 419 F.Supp. at 280, (quoted above on p. 966), that an IBT audit showed Local 1 to be late with per capita payments, it is important to add that the "lateness" and the international auditor's injunction to Local 1 to pay earlier seem technical in the extreme: the November payment, due December 20, was paid on that date; the December payment was one day late, the January payment two days late, the February payment three days early, the March payment ten days early, and the April payment two days late. These were the data on which the international auditor's verdict of tardiness was based.

In sum, we find that the two Executive Boards of Local 1 (*i. e.* the May '71— May '74 Board and the May '74—July '75 Board) carried out their duties between 1971 and July, 1975 in a responsible manner, managing their limited finances so as to meet their obligations in a timely fashion. The IBT audit in the summer of 1972 supports this finding. This in no way contravenes our earlier finding that the local's financial viability was "marginal," for throughout the years 1972–75 Local 1 clearly did not have any money to pay salaries to its officers or to engage in any organizing campaigns. Article VI § 4(b) was, in our view, substantially if not totally complied with.

The second relevant portion of the Constitution (relied upon by defendants) is Article XIV § 2(a)(1), which provides:

General membership meetings shall be held monthly at such place and time as shall be designated by the Local Union Executive Board subject to disapproval by the General Executive Board. The General Executive Board shall establish such conditions relative to the holding of meetings as in its judgment it deems advisable. Membership meetings may be suspended during any three (3) months between June and October by action of the membership at a meeting after reasonable notice of the intention to vote upon such question.

We find that this provision was not complied with during the period 1971—July

1975. We credit Bender's testimony that, on the occasion membership meetings were called, the response was not good, and we also find there were especial difficulties in conducting membership meetings because of the geographic dispersion of Local 1's membership, *i. e.* its members resided in both the Philadelphia and New York City areas. Nevertheless, the IBT Constitution does not excuse the lack of monthly meetings for these reasons, and the simple fact is there was not compliance with this provision.

The third Constitutional provision relevant to the IBT and Local 107's defenses is Article XXII § 1, mandating local union by-laws:

Section 1. Each Local Union shall adopt its own separate Bylaws which must comply, and may not conflict, with the provisions of the International Constitution. Said Bylaws shall designate as the principal executive officer the President, the Secretary-Treasurer or the Recording Secretary.

This provision was apparently one of the Constitutional changes enacted in May, 1971. In the IBT Audit dated June 15, 1972, the International Auditor called attention to the fact that Local 1 was not in compliance with this provision. We find that at no time during the period May, 1971 to July, 1975 did Local 1 have by-laws in effect. We credit Bender's testimony that he was aware of the requirement, that he started to draft a set on several occasions, but that neither he nor any other members of the Executive Board gathered sufficient momentum to draft a set of by-laws. Turning the coin over, however, we find that the IBT was clearly aware of the fact that Local 1 was in non-compliance with this provision as of June 15, 1972 (the date of the International Auditor's report), but that at no time between then and July, 1975 made any further request or demand that Local 1 enact by-laws. Nor did the IBT in any way indicate to Local 1 that the absence of by-laws was of any consequence: up until July, 1975, the IBT accepted regular monthly per capita payments from the

Executive Board on behalf of the local, accepted and approved regular trustees reports from the Executive Board of the Local, and in short treated Local 1's Executive Board as a bona fide regularly-constituted organization that was empowered to take actions on behalf of the membership of Local 1.

Article XXV defines the Executive Board of the local as follows:

Unless specifically provided otherwise, wherever this Constitution provides for action by the Executive Board of the International Union or any subordinate body, the words "Executive Board" shall mean "a majority of the members of the Executive Board present and voting at a duly called meeting."

We find that this provision was complied with on the two occasions material to Bender's salary claim—the March, 1974 resolution setting his salary for 1972–74, and the June, 1975 resolution setting his salary for 1975. On both occasions, the full Executive Board complement voted. The fact that they did so in two "sessions" as it were, with a group of three voting in New York and a group of four in Philadelphia does not alter this fact of compliance, since the two groups voted on identical salary resolutions, and since the resolutions were taken within ten days of each other. *See* p. 969 *infra.*

The foregoing are the only provisions of the IBT Constitution which the parties have pointed out to us, or which we have been able to locate in an independent review of the IBT Constitution, as relevant to whether the Executive Board of Local 1 had the authority to vote Bender a salary. We think it important to note what the IBT Constitution does *not* say. First, there is no provision describing which local union officials should be compensated, or in what amount. Second, there is no provision that spells out the authority of the Executive Board of the IBT's local unions, or describes what their powers are regarding, *inter alia*, voting salary for local officials. Nor are there any provisions requiring membership ratification of any actions taken by a local executive board. Third, there is no provi-

sion stating the consequence for failure of a local to adopt by-laws; in other words, although Article XXII § 1 makes by-laws mandatory ("shall adopt"), it is nowhere stated that in the *absence* of by-laws all actions by the executive board of a local are void *ab initio*, or that any other consequences flow from not having by-laws. Whether we should construe this interpretation into Article XXII § 1 is a legal matter, which we leave for the legal discussion to follow. In this fact-finding section, we simply find the IBT Constitution to be silent on the question of what consequences follow from a failure of a local Executive Board to adopt by-laws.

### 3. *The Executive Board Salary Resolutions at Issue*

As stated previously, Bender worked without compensation for Local 1 after January 1, 1972. On March 4, 1974, four members of the Executive Board of Local 1 met in Philadelphia (President Borrow, Vice President Jost, Secretary-Treasurer Bender and Trustee Myers). Bender was listed in the minutes as "not voting." Trustee Sam Van Fossen was listed in the minutes as "absent but in favor." The first order of business was to pass a resolution concerning Hoffa, which does not appear in the minutes of record. However, at a three-man Executive Board meeting in New York a week before, the following resolution had been adopted: "The Executive Board authorizes the Union's officers to join on behalf of the Union in a suit to be instituted by Mr. James R. Hoffa to challenge the validity of the conditions attached to the commutation of his sentence to permit him to participate in union activity." We assume the absent March 4 resolution by the Philadelphia branch of the Executive Board was to the same, if not identical effect. The suit referred to was *Hoffa v. Saxbe*, 378 F.Supp. 1221, filed March 13, 1974, in the United States District Court for the District of Columbia. Local 1 joined as a plaintiff in this suit, which challenged the restrictions on Hoffa's union activities which were imposed as a condition of the commutation of his sentence.

The second order of business at the March 4, 1974 Philadelphia Executive Board meeting was to vote on the following resolution: "Motion that Brother Bender be paid back to Jan. 1972 on the basis of $10,-000 per year (this shall be a liability of the Local and not of any individual member or Executive Board member) when and if the Local has the funds and $12,500 for the year 1974." The motion was seconded and passed unanimously. Both of the above motions are recorded in the minutes of this meeting, taken by Bender.

Ten days later, the three-man New York branch of the Executive Board met. The three Executive Board members adopted an identical resolution concerning Bender's salary. Bender apparently voted this time, and the resolution passed unanimously.

On June 17, 1975, a month prior to the GEB's order of merger, four members of the Executive Board met in Philadelphia and passed another resolution pertaining to Bender's salary. On this occasion, three of the members were the same as a year before (Bender, Borrow, and Jost), but Myers had been replaced in the intervening May, 1974 elections by Anthony Evasew. The vote was unanimous "to approve $15,000 a year for 1975 for salary for W. Bender for services." Bender apparently voted on this occasion. No contingency was included relating to the ability of Local 1 to pay, nor was it specified that this was to be an obligation of the Local only, and not its members. The minutes of that meeting reflect that a number of other matters were taken up, including filling a vacancy on the Executive Board, and obtaining IBT approval for an organizing campaign in the insurance industry. The minutes also apparently show that a resolution was unanimously adopted that the "local officers take any steps to prevent merger of Local 1 with any other local . . . or revocation of charter," but the minutes of this motion have been crossed out without explanation (the record of its unanimous approval was left intact).

Six days later, on June 22, 1975, the "New York" branch of the bifurcated Executive Board, consisting of Trustees Weed and Vitale, and Secretary-Treasurer Bender, met, and passed resolutions concerning filling a vacancy on the Executive Board, "taking any steps necessary to prevent involuntary merger of Local 1 . . . or revocation of the charter," arranging details of the membership drive at one of the insurance companies, and voting Bender "15,000 for the year 1975 when and if Local 1 ever has money." Each resolution carried unanimously.

The above salary resolutions constitute the basis for Bender's claim against defendant Local 107 and defendant IBT in the present suit: $10,000 for the years 1972 and 1973, $12,500 for 1974, and $15,000 for 1975.

The four resolutions contain certain ambiguities on their face. The March 4, 1974 and March 14, 1974 resolutions state that the 1972 and 1973 salaries are expressly conditioned on Local 1 obtaining sufficient funds to pay the amounts. Both resolutions are silent as to whether the 1974 salary obligation is similarly conditional. We resolve this ambiguity by finding the bifurcated Executive Board, voting on March 4, 1974 and March 14, 1974, intended that the 1974 salary was to be conditional on the local obtaining sufficient funds. We base this finding on our inference from the entire record: the Executive Board of Local 1 was scrupulous, during the entire period 1971–75, to conserve the slender resources of Local 1, and not to take any actions in violation of its fiduciary duty as officers of the local. See pp. 967–968 supra. To have approved the 1974 resolutions without the contingency would have been in gross disregard of that fiduciary responsibility. We infer that the Executive Board would not have done so, and therefore resolve the ambiguity in favor of implying the contingency provision into the votes on the 1974 salary. For an identical reason we resolve the ambiguity created by the differences between the June 17, 1975 and the June 22, 1975 resolutions pertaining to Bender's 1975 salary (the latter containing the contingency, the former not) in favor of implying the contingency into the June 17, 1975 resolution.

Additionally, we find that the Executive Board meeting procedure utilized on the above occasions, whereby the Board met in bifurcated sessions of respectively four and three members each, constructively complied with Article XXV of the IBT Constitution, (see p. 969 *supra*). The purpose of that provision is obviously to ensure that not *fewer* than four of the seven members of the Executive Board would take actions binding the local. The bifurcated meeting structure did not contravene this purpose, since at the two meetings, held within a week or ten days of each other, the full complement of Executive Board members had the opportunity to vote on the identical resolutions.

We find—indeed it was conceded by all—that Local 1 never had enough money to pay Bender a full salary at any time between January, 1972, and July, 1975, the date of the GEB merger order. However, at some point in 1975 (whether before or after July is not clear) Bender received $2,019 in salary. And in 1977, Bender used $5,500 in escrowed union dues (*i. e.*, check-off dues which an insurance company had paid into escrow during the pendency of the instant lawsuit) to pay himself a salary of $4,000, the rest being split between attorney and court reporter fees.

### 4. The Decision to Merge Local 1 and How it was Implemented

The reasons for the decision by the General Executive Board of the IBT to merge Local 1 with another local, and the method by which this was implemented, were discussed at great length in our earlier opinion. We only re-enter that terrain for purposes relevant to Bender's salary claim. We understand there to be two important factual issues involved: (1) *when* Bender and the Executive Board of the local first learned of the decision that Local 1 was to be merged with another local; and (2) whether the IBT, either before or after it issued its merger order, made any attempt to ascertain the existence of the salary obligation voted to Bender.

To answer the first question, we must begin considerably before the actual merger order of July, 1975. We earlier found (419 F.Supp. at 281) that the IBT had voted to merge Local 1 into another local in July, 1973, owing to Local 1's poor financial condition, *et alia*, but that "implementation of the decision to merge Local 1 traveled a more troubled course." *Id.* at 282. The ensuing attempts to find a suitable merger partner—in other words, an accommodating IBT local willing to take over the responsibilities of servicing Local 1's membership—have been documented in detail in our earlier opinion, and need not be recounted here. On May 2, 1974, the IBT voted to merge Local 1 into Local 115; both locals opposed the decision, Local 1, *inter alia*, by filing suit in Pennsylvania state court in June, 1974. In July, 1975, the GEB substituted Local 107 for Local 115 as a merger partner for Local 1. It is implementation of that merger order that has been in litigation before us since.

June 18, 1974, is the latest possible date on which either Bender or the Executive Board of Local 1 could have known that the IBT intended to merge Local 1 into another local, since that is the date of filing suit to halt the merger of Local 1 and Local 115. We credit Bender's testimony that he first learned of the possibility of a merger from James Hoffa in April, 1974, and that he first learned that the IBT actually intended to merge Local 1 in an official communication from the IBT in May, 1974. There was no evidence that any other officer of Local 1 learned of the IBT's intention at any earlier date than Bender. Hence we find that the Executive Board of Local 1 first had unofficial notice of a prospective merger in April, 1974, (which would have been two to six weeks *after* the March 4 and March 14th salary resolutions), and first received official notification in May, 1974, which would have been six to ten weeks after the salary resolutions.

Our second factual finding on this subject implicates the manner in which the IBT ordered the merger. We earlier found that "No notice was given to the affected locals, (Locals 1 and 115), but none is required by

the IBT's Constitution and Bylaws." 419 F.Supp. at 282 n. 35. Between July, 1973, and July, 1975, while the IBT was casting around for various merger partners, the entire decision-making occurred at the level of the General Executive Board of the IBT. Neither Local 1 nor any of the proposed partners (Locals 10, 111, and 115) nor the partner with whom merger was eventually ordered—Local 107—had any significant voice in the decision.[4]

We next find that at no time before it ordered the merger of Local 1 and another local, and specifically at no time before it ordered the merger of Local 1 and Local 107, did the IBT or its GEB or anyone on the IBT hierarchy make any inquiry of Bender or the Executive Board of Local 1 concerning the existence of financial obligations undertaken or financial commitments made by that local Executive Board on behalf of the membership of Local 1, including, of course, the Bender salary resolutions.

As to the sequence of events surrounding the actual merger decision between Local 1 and Local 107, we re-affirm our earlier factual finding:

On July 8, 1975, the GEB ordered that the previous decision merging Local 1 with Local 115 be amended to substitute Local 107 for Local 115, and Fitzsimmons wrote to Bender on July 16, 1975, notifying him of this decision. Local 107 is a large Philadelphia based local, the vast bulk of whose members are truck drivers. Local 107's recent history has been marked by internal strife, its fabric frequently tattered by violence. On July 21, 1975, Messrs. Cotter and Barlow, as representatives of the IBT, appeared in the office of Local 1 and demanded that Bender immediately turn over the local's charter, books, records, seal, bank accounts, membership lists, collective bargaining agree-

ments, minutes, etc., and handed him two letters dated July 16, 1975, one from Murray W. Miller and the other from Frank E. Fitzsimmons. Bender continued to protest the merger. Local 107, which had a complete executive board, made no provision to include Bender thereon. On September 9, 1975, Louis J. Bottone, President of Local 107, sent out formal notification to members of Local 1 informing those who were given notice that their membership obligations would thenceforth accrue to Local 107, 'as the successor to Local 1.' This notice was followed by a certified letter on September 17, 1975, from Bottone to Local 1's members containing dues checkoff forms, personal data sheets and a membership card in defendant Local 107 with the Local 1 member's name inscribed on it. These notices were prepared by the IBT for use by Bottone. Shortly thereafter the present lawsuit was filed.

We credit Bender's testimony that, upon receipt of the above notice from the IBT, he raised a number of questions with Louis Bottone, President of Local 107, concerning his continued employment and back salary. Bottone told him that he would no longer be employed by the new merged Local 107. Bottone also disclaimed responsibility for any back salary to Bender. Bender did not testify when this conversation took place. It would have been logical for such a conversation to have occurred immediately following the July 21, 1975 visit, and in the absence of any evidence from Bender that it occurred at a later date, we infer this was the date on which the Bender-Bottone conversation occurred.

### 5. The LM–3 Forms

The "Labor Organization Annual Report, Form LM–3" for Local 1 during the calendar years 1975 and 1976 were put into evi-

---

4. Indeed, during the two year period between July, 1973 and July, 1975, from the decision to merge Local 1 to the decision to merge it with Local 107, the IBT made no effort to solicit Local 1's views concerning a merger. Nor did it consult with any officers of Local 1 concerning the effect of a merger on Local 1's member-

ship, its organizing drives or any other matter of interest to the Local. The decision to merge Local 1 and the finding of an accommodating merging partner were carried out wholly without Local 1's consultation, input, advice, and knowledge.

dence. These forms implement the disclosure provision of 29 U.S.C. § 431(b) for unions with less than $30,000 in gross receipts for the year. The regulations for completing the LM–3 forms are contained in 29 C.F.R. § 403.4.

We find that the LM–3 form for Local 1 for the calendar year 1975 was signed by Mort Borrow as President of the Local and William Bender as Secretary-Treasurer, on May 18, 1976; that it shows receipts for Local 1 during the year of $9,114, and payouts during this year of $9,219, of which $2,019 went to Bender as salary. We find that items 29–32 inquire of any debts owed, and that these spaces have been left blank in the respective categories of "Accounts and bills payable," "loans and notes payable," "mortgages payable," and "other debts," respectively. In category 33 labeled "Total debts," the word "none" has been written. Nowhere on the form is there mention of any back salary owed to Bender.

The LM–3 form for Local 1 for the calendar year 1976 shows cash receipts of $3,552, payouts of $2,716 (no salary payments), and $940 in assets at the end of the period. No debts of any kind are listed in categories 29–33, and the word "none" is written under the category "total debts." A copy of the 1975 LM–3 form is attached as an appendix to this opinion. We credit Bender's testimony that he discussed the possibility of including his salary claim on the LM–3 form with the Local's accountant, and that the accountant advised him to omit reference to it because the salary was only to become due "when and if" the Local had the funds to pay it.

### 6.  *The Financial Condition of Local 107*

Local 1's merger partner, as already stated, is a large Philadelphia local with approximately 10,000 members, most of whom drive trucks. Its most recent financial reports of record are those for the period ending February, 1978. They show the following current asset position:

| ASSETS | |
|---|---:|
| Cash in Bank | $   51,387.76 |
| Cash in savings account | 546.55 |
| Savings bond | 520.00 |
| Land | 90,798.14 |
| Building | 89,206.91 |
| Furniture and fixtures | 49,871.23 |
| Total Assets | 282,330.59 |

| LIABILITIES | |
|---|---:|
| Loan balance to International | 90,000.00 |
| Accounts payable | 78,531.64 |
| Total Liabilities | 168,531.64 |
| Total Net Assets | $  113,798.95 |

Reviewing the last two months for which evidence was submitted, January and February, 1978, we find that in January, Local 107 received $121,584 in cash, and paid out $88,213, which amounted to a net cash increase for the month of over $33,300, and that for February cash received was $87,403 and payouts were $101,248, for a cash decrease of $13,845. The largest items of expense for each month (after the per capita tax paid to the International) were salaries for the officers and business agents of Local 107. We credit the testimony of Kenneth Moore, Secretary-Treasurer of Local 107, that there are ten full-time officers and business agents currently on the payroll, each earning approximately $35,000 per year. This converts into a figure of approximately $27,500 per month for all ten.

### B.  *Discussion*

#### 1.  *Introduction*

In their various papers, defendants Local 107 and IBT interposed ten defenses which they believe shield them from assuming liability for Bender's salary claims. Those defenses are:

(a) This Court is without jurisdiction to adjudicate the matter.

(b) All actions taken by the Executive Board of Local 1 are invalid because of its failure to enact bylaws or otherwise follow the IBT constitution; the salary resolutions were therefore unauthorized and void *ab initio.*

(c) The membership of Local 1 did not ratify the Executive Board's salary resolutions.

(d) The salary resolutions were violative of the local Executive Board's fiduciary duty under Article VI § 4(b) of the IBT Constitution.

(e) The salary resolutions were fraudulent because they were made at the time the local Executive Board knew a merger was imminent—in other words, they were a mere artifice to bind another organization after the merger.

(f) The members of the Executive Board thought James Hoffa, not Local 1, would pay Bender's back salary.

(g) No claim of Bender's for salary was included in the LM-3 form submitted to the Labor Department.

(h) Bender's salary claim had a condition precedent—that Local 1 had the ability to pay; this condition precedent never came to pass because Local 1 was merged into Local 107 and therefore ceased to exist.

(i) Defendant 107 did not expressly assume responsibility for Bender's salary claim.

(j) The IBT Constitution shields the IBT from any liability flowing from a merger unless the IBT has expressly assumed such liability; the IBT did not expressly assume responsibility for Bender's salary claim.

At trial, there was added the defense that the "when and if" condition has not been met because Local 107 does not have sufficient funds to pay Bender's salary.

Aside from the first defense, which goes to our power to hear the claim at all, the remaining ten may be divided into two categories. First are those that address the issue whether the Executive Board of Local 1 created a bona fide obligation by its salary resolutions, binding on Local 1 as an organization. Put differently, if Bender had sought a declaratory judgment in a suit against Local 1 at some point prior to the merger, would we have held that a bona fide salary obligation had been created by

the Executive Board resolutions? The second group of defenses addresses the issue whether, assuming arguendo a valid obligation was created between Bender and Local 1, that obligation can legally be binding on either Local 107 or the IBT. We think that parsing out these analytically distinct questions is helpful in deciding the validity of Bender's claims. It appears to us that defenses (b)–(g) are directed toward the first issue, and the remainder toward the second. (Defense (g) logically impacts upon both issues).

We deal with the defenses seriatim.

### 2. Jurisdiction

Bender has alleged jurisdiction of his salary claims both under 29 U.S.C. § 185 and under the doctrine of pendent jurisdiction. Defendants have stoutly maintained we do not have jurisdiction over Bender's salary claim under 29 U.S.C. § 185 because that statute, which provides for federal jurisdiction over contracts between employers and labor organizations, or between labor organizations themselves, does not govern a contract of employment executed between a local union officer and the local union. They have just as stoutly asserted we do not have pendent jurisdiction, but have cited no authority to support the assertion. We made a ruling during trial that we would exercise pendent jurisdiction over Bender's salary claim without reaching the question of federal question jurisdiction. We now re-affirm that ruling.

Bender's entire complaint contains a number of counts, most of which are founded on 29 U.S.C. § 185, and virtually all of which center around the reasons the IBT ordered the merger of Local 1 into another local. Bender's salary claim, Count V, is intimately tied to the whole merger decision since it was the financially weak condition of Local 1 which led to the merger decision (see 419 F.Supp. at 285) and which also led Local 1's Executive Board to make a salary commitment that was contingent upon the local obtaining funds it did not then possess. The merger decision, the subject of all counts of the complaint, is also intimately

connected with the salary claim since the merger decision extinguished forever the possibility that Local 1 *qua* Local 1 could obtain funds to pay Bender's salary. Indeed, we have rarely encountered a case where the federal and state claims more nearly "derive[d] from a common nucleus of operative fact." than does the present case. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Exercising pendent jurisdiction over the salary claim identifies that state, not federal, law is to be employed; it does not identify which state law is appropriate. In the case at bar, a thorny choice of law question might conceivably be present inasmuch as: 1) plaintiff is a New York resident; 2) the "contracts" at issue were "made" in both Pennsylvania and New York, where the bifurcated Executive Board voted the resolutions; 3) the subject matter of the contracts—Bender's work for Local 1—involved servicing existing members of Local 1 in New York, Pennsylvania and New Jersey, and organizing new members of the local in those states; 4) one defendant (Local 107) has its principal place of business in Pennsylvania, and most of its members reside there; and 5) the other defendant (the IBT) has its principal place of business in Washington, D.C., with its members distributed throughout all fifty states. However, since: (1) Pennsylvania is the only state whose law the parties have invoked;[5] (2) Pennsylvania certainly has a significant relationship to this matter; and (3) none of the parties has suggested there is any variation among the laws of the possibly applicable states, we will apply Pennsylvania substantive law to the legal issues.

3. *Are the Executive Board's Salary Resolutions Valid, and Binding on the Defendants?*

    (a) *The failure to enact bylaws*

The defendants' argument concerning bylaws has been stated as follows:

Article XXII, Section I of the IBT Constitution requires local unions to adopt bylaws to govern their conduct. Local 1 never did so . . . The Executive Board action [of Local 1] in the absence of bylaws governing the procedures to be followed for creating salary obligations and disbursing unions funds . . . contravened Article XXII, Section 1 of the IBT Constitution.

First, defendants mistakenly believe that bylaws were necessary under the IBT Constitution in order to authorize local Executive Boards to determine compensation for local officers. We might agree with defendants that bylaws were necessary in order to authorize a salary resolution if the IBT Constitution stated that procedures for determining officer compensation must be included in bylaws, or *if* it said that in the absence of such a bylaw procedure all actions by the local Executive Board concerning officer compensation would be unauthorized and void *ab initio*. But the IBT Constitution contains no such provisions. Rather, the Constitution contains simply the naked mandatory language that locals "shall adopt" bylaws. The Constitution is wholly silent on what matters should and should not be included in those bylaws. Hence, Local 1 could have fully complied with the Constitution by enacting bylaws—which would have satisfied defendant's instant objection—and yet not included any officers' salary provisions as part of those bylaws. Nor does the IBT Constitution state that without bylaws the local Executive Boards are without authority to act on certain matters.

In sum, we cannot possibly conclude, as defendants ask us to, that IBT Constitutional provision Article XXII § 1 requires us to declare void *ab initio* an Executive Board action concerning officer compensation taken in the absence of a bylaw provision for the IBT Constitution does not specify that such a provision would be appropriate or necessary to local bylaws, and does not, in any event, permit the reading that such a bylaw provision is the only possible authori-

5. *See Henry v. Richarson Merrell,* 508 F.2d 28 at 34 n. 14 (3d Cir. 1975).

ty for such an Executive Board action. For identical reasons, we cannot conclude that 29 U.S.C. § 431(a)—which contains a by-law requirement similar to the IBT Constitution—dictates declaring the instant salary resolutions void *ab initio.*

■ Second, defendants are mistaken in supposing that the law generally requires bylaw authorization for salary compensation. In our view, officer salary compensation is part of the inherent authority of the Executive Board, and does not depend on the presence or absence of a bylaw for its legality. For example, when we examine a close analogy to our situation—the voting of officer compensation by the Board of Directors of a corporation—we find, according to *Ballantine*, that "[i]t is ordinarily within the power of the directors to fix the compensation of officers, executives and employees appointed by them." *Ballantine Corporations* 190 (1946). We read this to mean it is within the Board of Directors' inherent authority to fix such compensation, *i. e.* the authority is not dependent on the presence of bylaws. Similarly, Pennsylvania corporation law provides that *"[u]nless the articles or by-laws provide otherwise*, the board of directors shall elect and fix the compensation of . . . officers . . . .," including president, secretary, treasurer, *et al.* 15 *Purdons* § 1406 (1977 Supp.) (emphasis supplied). As we read this statute, it in effect presumes that boards of directors have inherent authority to fix the compensation of executive officers. Particular bylaws are necessary only to *rebut* that presumption, by placing authority elsewhere. In this claim to which Pennsylvania law is being applied, we predict that a Pennsylvania State Court would employ this statutory provision, which by its terms applies only to corporations, (labor unions being of course unincorporated associations) if it had before it our claim, because of the fundamental nature of the principle involved, as illustrated by *Ballantine.*

■ Third, we conclude that defendant IBT has waived any objection to the failure of Local 1 to enact bylaws, or is estopped from setting up this defense in an effort t. deny the validity of the salary resolutions. As we found in the fact-finding section, the International was aware of Local 1's failure to enact bylaws from at least June 15, 1972 (the date of an IBT audit of Local 1) until the merger order in July, 1975. During those three years the IBT apparently never indicated that any actions by the Local 1 Executive Board were void *ab initio* simply because there were no bylaws. The International never claimed that members of the Local 1 Executive Board could not negotiate contracts for union members with employers, although no local bylaw provision granted such authority, and many such contracts were negotiated. The International never claimed members of the Local 1 Executive Board could not represent union members at grievance procedures, despite the absence of bylaws authorizing this. The International never claimed the Executive Board of Local 1 was without authority to collect per capita dues from union members and send those dues to the International—in fact, during those years many thousands of dollars were disbursed by the Executive Board of Local 1 to the International's treasury, and each of these monthly disbursals should, by the logic of defendants' position, be declared void *ab initio* because no local bylaw prescribed the procedure. In short, for three years, the International treated Local 1's Executive Board as a duly-constituted body possessing the full authority of every other Executive Board of every other IBT local. Never once during these years was any further demand made on Local 1 to enact bylaws, or any statement made of which we are aware that the failure to adopt bylaws would lead to any disciplinary sanctions under the IBT Constitution (*see* Article VI § 5(a).) We think the above constitutes a waiver or estoppel by the International of the bylaw defense, (although we do not believe defendant Local 107 has waived or is estopped from asserting this defense).

For the foregoing reasons, we reject defendants' claim that the failure to enact

bylaws makes the salary resolutions of Local 1's Executive Board null and void.[6]

### (b) *Lack of membership ratification*

■ The reasons for which we rejected the bylaw defense compel our rejection of the defense of lack of membership ratification: a) the IBT Constitution does not require membership ratification of this type of executive board action, or declare that in the absence of membership ratification a salary resolution by the executive board is void *ab initio*; b) membership ratification does not appear to be customary among other IBT locals for officer compensation voted by their respective executive boards (although evidence on this point is scanty), hence Local 1's board followed the normal, customary and usual practice in not seeking ratification; and c) the citations to *Ballantine* and 15 *Purdons* § 1406 above demonstrate that membership ratification is not a usual legal requirement when a Board of Directors (and by analogy an Executive Board) votes on officer compensation. To the above we add one additional factor. The purpose of membership ratification would have been to protect the members of Local 1 from fraudulent or irregular conduct on the part of officers and Executive Board members of Local 1. Yet the uncontradicted and overwhelming evidence in this case is that plaintiff Bender enjoyed enormous support from virtually the entire membership of Local 1 before, during, and after the salary resolutions.[7] There is no doubt in our minds that, had the salary resolutions been submitted to the members of Local 1 in March, 1974 or June, 1975 (when the resolutions at issue were passed by the Executive Board) they would have been ratified, perhaps unanimously. Given this ambience of support for Bender by Local 1 membership and given the purpose ratification serves, we do not see how defendants can rely on a failure of ratification to defeat the salary resolutions.[8]

### (c) *Violation of fiduciary duty*

■ Of all the defenses, this one seems to us the least meritorious. Indeed, we cannot conceive of how defendants can seriously argue that the salary resolutions violated Local 1 Executive Board's fiduciary duty as expressed in the IBT Constitution Article VI § 4(b). The salary resolutions were contingent on Local 1 obtaining sufficient funds precisely *because* Local 1 did not then have the funds. Any resolutions *other* than the contingent ones that were in fact adopted would have been in violation of the Constitutionally-imposed fiduciary duty that the local union not take any action that interferes with its conducting its affairs "as a solvent organization." Nor can we find any violation of 29 U.S.C. § 501(a), which contains a provision virtually identical to the IBT Constitutional provision.

### (d) *Knowledge of the merger; The Salary Resolutions As a Sham*

Defendants argue that, upon learning of the merger, the Executive Board and Bender contrived the salary vote, hoping it would bind the successor to Local 1; hence the resolutions are nothing but a sham.

Part of this argument is refuted by the facts. We earlier found that, while the

---

**6.** We also conclude that there was no violation of the IBT constitutional provisions relative to composition and meetings of the Executive Board.

**7.** For example, plaintiff introduced credible evidence that in October, 1975, three months after the merger order, at least fifty-four members of Local 1 wrote to IBT President Fitzsimmons to protest the merger order, stating, "We are writing to advise you that we have been highly satisfied with the work of Mr. William Bender. He pursued our demand with diligence and enthusiasm and has impressed all of us favorably." The petitions are illustrative of the record evidence of Local 1 membership support for Bender. Defendants did not produce any evidence of membership disproval of Bender's work. Moreover, the rate of compensation voted to Bender was if anything far below what prevailed in IBT local unions, and clearly below what a man of Bender's capabilities and experience could have earned) in another union position.

**8.** Neither do we believe that the failure of Local 1 to conduct regular membership meetings in any way vitiates Bender's salary claim.

first salary resolutions were adopted in March, 1974, Bender and the Executive Board did not learn of a possible merger until April, 1974, and that they first officially learned of the IBT's intention to merge Local 1 into another local in May, 1974. It is the latter date which must govern for our purposes, since rumors (even when coming from one as knowledgeable about IBT affairs as ex-official James Hoffa) are not legally sufficient to put the Local 1 Executive Board on notice of a merger. Indeed, defendants offered no evidence that the Executive Board of Local 1 learned of the merger plan before May, 1974. Therefore, the March 1974 salary resolutions, which applied to salary between January 1, 1972, and the end of 1974, having been adopted two months before the Executive Board knew of the merger plan, is not subject to this defense. Defendants' argument can only apply to the salary resolutions, voted in June, 1975, governing the salary from the beginning of that year on.

The June, 1975 resolutions were made thirteen months after Local 1 learned the IBT was trying to merge it with another local, and a month before Local 1 received the actual order to merge with Local 107. These circumstances raise the possibility, of course, that the June, 1975 salary resolutions were not bona fide. But possibility alone is not sufficient. Defendants must demonstrate that Bender and the Executive Board colluded to perpetrate a fraud on Local 1's successors. The record is simply barren of any evidence of collusive intent. The 1975 salary resolution is as customary in terms of compensation as is the 1974 resolution. There is no contention that Bender did not work with the greatest diligence to earn the right to compensation from the beginning of 1975 on; and the amount is only $2,500 more than the salary voted for 1974 ($15,000 versus $12,500), an amount that seems eminently reasonable as a combined raise and inflation increment. In short, we take the 1974 resolution as bona fide since the temporal sequence thereof precludes even the possibility of collusion; and, using that resolution as a

standard, the 1975 resolution seems reasonable and wholly regular in comparison.

(e) *The Alleged Contingency of Hoffa's Return to Power*

The argument that the salary resolutions were a sham is further advanced by defendants' contention that the Executive Board never entertained any realistic possibility Local 1 would be able to pay Bender the salaries owed, but counted, if not upon a merger, then upon Jimmy Hoffa's returning to power within the IBT and bestowing on Local 1's treasury money sufficient to meet the salary obligation as a reward for Local 1 joining the suit of *Hoffa v. Saxbe*, 378 F.Supp. 1221 (D.D.C.1974), p. 969 *supra*. We do not find this argument persuasive.

In the first place, defendants have sought to establish this point only by virtue of the deposition of one of the Executive Board members, Anthony Evasew. Leaving aside the hearsay problems of relying on this evidence, we note that six executive board members voted on the salary resolutions, with the seventh member, Bender, abstaining. To show that *one* member of the Board had a particular idea of how the funds were to be obtained tells us nothing about any of the other members of the Executive Board. Hence, defendants have adduced an insufficient amount of data by which to impeach the salary resolutions.

In the second place, contrary to what defendants would have us suppose, we think the Executive Board could have entertained another possibility for Local 1 obtaining the funds to pay Bender a salary—as dues from the results of Bender's organizing drives. We earlier found, 419 F.Supp. at 280 n. 32, that Local 1 retained approximately $6.00 per month from every member. At that rate, Local 1 would have had to increase its membership by 1,666 to generate an extra $10,000 per year, the lowest amount of Bender's salary for these years, and in-

crease its membership by 2,500 to achieve an extra $15,000, the highest salary at issue. While these figures may seem "unrealistic" in relation to Local 1's actual membership during these years—between 43 and 115 members—they are not unrealistic when compared with the scope of Bender's organizing drives. His attempts, which at several times verged on major breakthroughs in union organizing, involved thousands of workers in the insurance industry (and many in the greeting card industry). Hence there is another plausible motive for the Executive Board of Local 1 voting Bender the salary besides the slender hope Hoffa would confer International funds on the local. Moreover, this possibility we have hypothesized is one befitting the contingent obligation at issue: Bender's salary would be paid when and if the local had funds, and the local would have funds when and if the organizing drives on which Bender had devoted so much energy came to fruition.

We add to the foregoing only our view that, so long as the Executive Board's action was not a sham (and we find that it was not), we think the discussion of *any* motive on the part of the Executive Board to be irrelevant. The Executive Board's resolution was in effect a contract with condition precedent: Bender's salary was to become due and owing when Local 1 obtained the funds to pay. That is the only condition. The condition is *not* "when Local 1 obtains the funds from Jimmy Hoffa," nor is it "when Local 1 obtains the funds from organizing drives and new members." Neither those nor any other specific eventualities were part of the resolutions, and hence none are relevant to the condition precedent being fulfilled. Therefore, defendants' argument concerning Executive Board hopes about Jimmy Hoffa simply miss the mark.

### (f) The LM–3 Forms

Of the myriad defenses advanced in this litigation, none has been advanced more strongly than the one pertaining to LM–3 forms. We earlier described the LM–3 forms (pp. 972–973 *supra*), which are reports labor unions are required to file with the Secretary of Labor by virtue of 29 U.S.C. § 431(b). Pursuant to 29 U.S.C. § 438 and 29 C.F.R. § 403.4, a labor union with annual receipts of under $30,000 may file a "simplified" LM–3 form. An organization with receipts in excess of this amount must file the more extensive LM–2 form. At all times pertinent to this lawsuit, Local 1 had gross annual receipts of less than $30,000, and hence was required to file only the LM–3 forms.

Defendants' argument rests on equating the LM–2 and LM–3 forms. The LM–2 form is a detailed statement of organizational finance, necessitating several hundred entries over four closely-printed pages. Question 19 asks "Did your organization have any contingent liabilities?"

In contrast, the LM–3 form is extremely simplified. As shown on the 1975 form, a copy of which is attached as an appendix to this opinion, only four questions relate to debt: question 29, on accounts payable, question 30 on loans and notes payable, question 31 on mortgages, and question 32 on "other debts." Nowhere on the form does the word "contingent liability" occur. Nor do the instructions accompanying the LM–3 form refer to any contingent liability. The sparse instruction for question 32 merely state "enter all other debts of the organization which have not been listed on lines 29, 30 and 31."

Defendants' argument runs as follows: Bender's salary obligation was a contingent liability, contingent on Local 1 obtaining sufficient funds; the LM–2 form (which Local 1 did not have to fill out) explicitly requires disclosure of contingent liabilities; the LM–3 form (which Local 1 did have to fill out), together with its instructions, require disclosure of "all debts"; a contingent liability is part of the category of "all debts" and should have been disclosed to

the Government; failure to make such disclosure to the Government means either that the obligation itself never existed, or that plaintiff is barred from imposing the debt on defendants. In other words, defendants apparently draw two different conclusions from the absence of any mention of the salary resolutions in Local 1's LM–3 forms. First, they apparently believe the absence "proves" there was no debt ever created, buttressing arguments advanced elsewhere that the salary resolutions were simply a "sham" made in contemplation of the merger (*see* pp. 977–978 *supra*). Alternatively, defendants seem to be arguing that, assuming arguendo there may have been a bona fide debt created between Bender and the Executive Board of Local 1, that debt, because of some kind of estoppel, cannot be transferred or imposed on either the IBT or Local 107 because it was not disclosed on the LM–3 form.

We reject the first conclusion. Absence of mention of the salary resolution does not "prove" there was no contingent liability, because strong and credible evidence of the liability exists elsewhere (in the minutes of the meetings at which the resolutions were taken, and in testimony of those present about the resolutions), and because the LM–3 form does not clearly require disclosure of "contingent liabilities." We earlier credited Bender's testimony that neither he nor the certified accountant employed by Local 1 believed the LM–3 form sought information about a debt that would only become owing "when and if" the local had the funds. Their conclusion seems to us reasonable when one peruses the LM–3 and its accompanying instructions and fails to find one single word that is reasonably calculated to put a person on notice that a contingent liability like the salary resolution ought to be included. Hence we cannot conclude that the failure to report the contingent debt reflects anything other than a reasonable belief that no reporting of this kind of future obligation was required; such failure is simply not probative

evidence that the obligation itself does not exist.

We similarly reject the second conclusion, that (assuming arguendo reporting was required) failure to report the obligation on the LM–3 form bars imposition of the debt on defendants. We think this argument would be valid if, and only if, two conditions were both met: first, that defendants actually relied on the LM–3 forms to their detriment in making the merger decision; and second, that the LM–3 form was, by its purpose and design, the kind of instrument in which defendants could put justifiable reliance in making a merger decision. While both of the above would be necessary conditions, we find that neither has been satisfied in our case.

As to the first, defendants made no showing that they actually relied on any LM–3 forms in deciding to merge Local 1 and Local 107. No one from the General Executive Board of the Teamsters International testified that the LM–3 information played any role in the decision to merge Local 1. Similarly, no officer of Local 107 testified that he relied on the LM–3 forms in any aspect of the Local 1 and Local 107 merger matter. That in itself defeats the argument, for defendants cannot claim they were injured by not having available to them certain information on the LM–3 form when they never attempted to use any LM–3 information in making their decision.

We note in this regard not only that defendants did not rely on the LM–3 form at the time the merger decision was made, but also that at no time did they ask the Executive Board of Local 1 about any possible contingent liabilities the local might be obligated for in the future. Rather, the record supports the view the merger decision was executed by defendant IBT without consulting Local 1, or requesting any information from it prior to the merger, and in fact informing Local 1 that it had been merged with Local 107 only after the order was a *fait accompli*. In those circumstances, we think it unjust for defendants,

having executed the merger order, and having found to their great surprise that a contingent salary obligation existed of which they were unaware and of which they apparently made absolutely no effort to become aware prior to the merger order, to attempt to disclaim liability because the future debt was not included on an LM–3 form, especially when that form does not clearly require disclosure of such information.

■ Second, even if we assume arguendo that the LM–3 form clearly required disclosure of the "when and if" obligation and that defendants actually relied on the LM–3 form in making their merger decision, defendants still would not have shown that the LM–3 form was intended to be the kind of instrument on which a business association parent (the IBT) could place justified reliance in deciding whether to merge two of its subsidiaries (Local 1 and Local 107). The purposes of the LM–3, and the reporting scheme of which it is a part, have been set forth by Judge Van Dusen in *Antal v. District 5, United Mine Workers of America*, 451 F.2d 1187 (3d Cir. 1971). Those purposes are threefold: first, to provide the Labor Department with a means to correct corrupt labor leadership practices; second, to provide members of a union information about their leaders, to be used in making informed voting decisions; and third, to provide the general public with information about the practices of union leaders, on a "sunshine" rationale. *Antal* quotes legislative history that demonstrates these purposes:

> It is the purpose of this bill to insure that full information concerning the financial and internal administrative practices and procedures of labor organizations shall be, in the first instance available to the members of such organizations. In addition, this information is to be made available to the Government, and through the Secretary of Labor, is to be open to inspection by the general public. By such disclosure, and by relying on voluntary action by members of labor

organizations, it is hoped that a deterrent to abuses will be established.

\* \* \* \* \* \*

> The committee believes that union members armed with adequate information and having the benefit of secret elections, as provided for in title IV of this bill, will be greatly strengthened in their efforts to rid themselves of untrustworthy or corrupt officers. In addition, the exposure to public scrutiny of all vital information concerning the operation of trade unions will help deter repetition of the financial abuses disclosed by the McClellan committee.

House Report No. 741 (86th Cong. 1st Sess., 2 U.S.Code Cong. & Admin.News, 1959, p. 2424), *quoted at* 451 F.2d at 1189. *See also United States v. Budzanoski*, 462 F.2d 443, 450 (3d Cir. 1972).

■ Defendants seek to add two additional purposes to the three described by Judge Van Dusen: to provide a parent organization like the Teamsters with all the information necessary to make an informed decision about whether to merge two of its subsidiary organizations, and to provide a subsidiary organization like Local 107 with information to refrain from objecting to merger with another local. Such purposes are clearly far different from anything Congress had in mind in enacting 29 U.S.C. § 431(b) and (c). An organization parent like the International Brotherhood of Teamsters has available to it any number of internal reporting devices to secure from its subsidiaries all relevant financial information needed to make, *e. g.* merger decisions. Moreover, a subsidiary like 107 ought to be able to avail itself of its parents' resources. In effect, therefore, defendants demand that LM–3's serve the function that their internal reporting system should have served but did not, apparently because the International never requested information from Local 1 that would have disclosed the existence of the salary resolutions. We cannot conclude the LM–3's are intended to

serve the function defendants would have them serve.[9]

For the above reasons we reject defendants' arguments concerning the LM–3 forms.

(g) *The Defense That the Condition Precedent Never Came to Pass Because Local 1 Never Obtained the Funds*

■ Defendants apparently recognize that the salary resolution is in reality a contract with condition precedent—the condition being, of course, that Local 1 obtain sufficient funds to pay the salary. They argue that the condition precedent was never fulfilled. Of course, Local 1 never came to have sufficient funds because it was merged with Local 107, (with the latter being designated the successor organization) while Local 1 still had miniscule assets. Since Local 1 has ceased to exist, the argument runs, it is impossible that the condition precedent can ever be fulfilled.

The fallacy of the argument lies in assuming that upon a merger, all of the contingent liabilities of the nonsuccessor merged organization are legally extinguished. On the contrary, far from being extinguished, they are transferred, in precisely their pre-merged status, to the successor organization. In other words, upon the merger of Local 1 and Local 107, and the designation of Local 107 as the successor organization, all of Local 1's obligations, whether contingent or otherwise, were transferred to Local 107. Therefore, if Local 1 had a valid pre-merger contingent liability—a salary obligation with condition precedent—that liability, in exactly its same form, was transferred to Local 107 by

---

9. Not content with relying on the labor forms themselves, defendant IBT cleverly sought to create authority for its position with the help of the United States Department of Labor. On March 30, 1978, a week after our final hearing on Bender's salary claim, and after we had closed the record counsel for IBT solicited the views of the Labor Department on whether the specific contingent liability at issue in our suit should be included on the LM–3 form. The "opinion letter" received from the Labor Department reads as follows:

Ms. Roslyn A. Mazer
Dickstein, Shapiro & Morin
2101 L. Street N.W.
Washington, D.C. 20037

Dear Ms. Mazer:

The following is provided in answer to your inquiry dated March 30, 1978.
Section 201(b) of the Labor Management Reporting and Disclosure Act of 1959, as amended requires that the financial report be in such detail as may be necessary to accurately disclose the financial conditions and operations for the preceding fiscal year.
An Agreement to pay a union officer's salary "when and if the local has the funds" indicates future indebtedness. This debt should be disclosed on the LM–3 form if (a) it materially affects or could affect the financial condition of the union and (b) this is information that a union member has a right to know. Since payment of the debt depends on "when and if the local has the funds," it should be disclosed in Item 32 of Form LM–3, with an explanation in Item 21 unless such agreement is later rescinded by the governing body.
Thank you for your inquiry.
Sincerely yours,
/s/
Bonnye K. Newkirk, Accountant
Section of Audit
Telephone: 202–523–7457

The letter was first submitted under the guise that it was legal authority or precedent, which plainly it is not. In terms of potential evidentiary status, it was submitted after the record was closed and we rejected it on that ground alone. Moreover, to the extent that its submission might be deemed timely, it is hearsay and not within the exceptions of F.R.Evid. 803(8), hence inadmissible in any event. We did order the letter to be part of the record for purposes of review. Were we, however, to consider Ms. Newkirk's letter we would read it as supporting our conclusion. Ms. Newkirk stated the contingent liability should only have been disclosed on the LM–3 form if it was "information a union *member* has a right to know." This is consistent with the *Antal* opinion and the legislative history on which the opinion is based, that the primary intended beneficiaries of disclosure are union members. The Labor Department's letter provides no support for defendants' view that parent labor organizations making these decisions (the IBT) or subsidiary labor organizations making merger decisions (Local 107) are intended beneficiaries of LM–3 information.

virtue of the merger, and it became 107's obligation with condition precedent.

While this legal conclusion seems patent, express authority therefor is found in 15 *Purdons* § 1907. We determine that the Pennsylvania courts, whose law we follow, would apply this statute to a case like ours involving unincorporated associations, since there is no Pennsylvania statute on the merger of unincorporated associations and since the policies that find expression in 15 *Purdons* § 1907 are so fundamental. The pertinent portions of that statute provide:

> All the property, real, personal, and mixed and franchises of each of the corporations parties to the plan of merger or consolidation, and all debts due on whatever account to any of them, including subscriptions to shares and other choses in action belonging to any of them, shall be taken and deemed to be transferred to and vested in the surviving or new corporation, as the case may be, without further act or deed. *The surviving or new corporation shall thenceforth be responsible for all the liabilities and obligations of each of the corporations so merged or* consolidated, but the liabilities of the merging or consolidating corporations, or of their shareholders, directors, or officers, shall not be affected, nor shall the rights of the creditors thereof or of any persons dealing with such corporations, or any liens upon the property of such corporations, be impaired by such merger or consolidation, and any claim existing or action or proceeding pending by or against any of such corporations may be prosecuted to judgment as if such merger or consolidation had not taken place, or the surviving or new corporation may be proceeded against or substituted in its place.

(emphasis supplied). Since, under this statute, Local 107 as the surviving organization is responsible for "all of the liabilities and obligations of each of the corporations so merged," it must necessarily be responsible for a contingent liability, or otherwise put,

a contract with condition precedent. To us this disposes of any possibility the condition precedent in Local 1's contract was somehow extinguished at the time of merger, and could never come to pass.

(h) *The Defense That the Condition Precedent Never Came to Pass Because Local 107 Does Not Have Sufficient Funds*

■ Given the foregoing analysis the defendants, if they are to prevail on the condition precedent theory, must contend that the plaintiff has failed to prove Local 107's ability to pay Bender's salary. Local 107's ability to pay the obligation was the subject of our last hearing. Extensive financial data concerning Local 107 was introduced, which has been briefly summarized on p. 973 *supra*. That data shows Local 107 to have current net assets well in excess of $100,000, and to have a cash flow to support ten full time salaried officers each earning $35,000 per year.

The salary resolution's "when and if" language do not import any clear legal standard by which to determine whether the condition precedent was fulfilled. In our view, the proper standard for determining whether Local 107 has the funds to pay the obligation is the IBT Constitution, Article VI, § 4(b):

> (b). Local Unions shall not adopt Bylaws or take any action which would impair their ability to meet their financial obligations to their members in the negotiation and administration of collective bargaining agreements and in conducting the affairs of the Local Union as a solvent organization.

Utilizing the above standard, we think plaintiff Bender met his burden of establishing a *prima facie* case that Local 107 has sufficient net assets and cash flow to pay a $33,000 debt. If there was any reason why it could not, defendant Local 107 did not come forward with it. Indeed, even under a more stringent test, we believe that Local

107 is in a sufficient financial position to pay. We conclude, therefore, that the condition precedent has been satisfied, and that the contingent salary obligation has become a liability presently due and owing, payable by Local 107.

### (i) *The Argument That Local 107 Never Expressly Assumed the Obligation*

The above statute, 15 *Purdons* § 1907, disposes of this defense as well. The transfer of the contingent liability from Local 1 to Local 107 occurred as a matter of law. It was not dependent on an express assumption on the part of Local 107, and therefore the lack of such an express assumption cannot be a defense.

### (j) *The IBT's Defense Predicated Upon Article X of the IBT. Constitution*

The IBT's Constitution provides the defendant IBT with a complete defense to the liability at issue in this suit. Article X § 13 provides:

> However, in no event shall the International Union without its consent become liable for the obligations of a subordinate body which has seceded, disaffiliated, dissolved or been dissolved, or has been suspended, merged, or has forfeited its charter.

There is no question that the International did not consent to becoming liable for the obligation; similarly, there is no question but that the defense, as provided for in the IBT Constitution, is a complete defense which, if it can be given effect, will wholly shield defendant IBT in this case. The only question, then, is whether the defense may be given effect.

The defense predicated on the IBT Constitution might well work an injustice in certain cases. For example, if a person deciding whether to become a general, unsecured creditor of one local made a thorough investigation of that local's financial condition, found its health to be excellent, and decided to loan money, and the IBT soon thereafter, with no notice or warning, merged that local into another local on the verge of bankruptcy, designating the latter local the successor organization, and then disclaimed any liability by virtue of Article X § 13, we think that invocation of that defense might be tantamount to fraud: having engineered and executed the merger in those circumstances, the International might not be able to rightfully disclaim resulting liability. In such a circumstance, we might be forced to invalidate Article X § 13 or at least limit the circumstances in which it could be given effect as a matter of federal common law. One of our authorities for so doing would be *Republic Steel Corp. v. UMW*, 570 F.2d 467 (3d Cir. 1978), which we read as an expression of the Third Circuit's determination to make International Unions accountable for the actions of subsidiary locals over which they exercise control.

However, our hypothesized facts are simply not this case. In our situation, there was no fraud on any creditor, since a local with diminutive assets was merged into a much larger and more financially secure local. Therefore, we would be unjustified on this record in doing anything other than giving full effect to the complete defense for the IBT contained in Article X § 13 of its Constitution.[10]

---

**10.** It may seem anomalous to absolve IBT from liability but to hold liable Local 107 although we have found that the IBT ordered Local 107 to effectuate the merger without giving that Local a significant voice in the decision-making process. *See* text n. 4 *supra*. Yet this result is what we have determined the law to require.

Local 107 has never asserted a cross-claim against the IBT pursuant to Fed.R.Civ.P. 13(g) at any time in our proceeding. Local 107 may well have or have had, valid grounds for imposing complete or partial liability on the IBT for Bender's salary claim, based on representations made to the Local by the IBT at the time of merger, or based on other grounds. However, since no crossclaim of any type was asserted, our record is wholly devoid of evidence probative on this issue. Accordingly, we express no opinion on the matter.

### 4. Summary; Computation of Damages

To summarize the discussion thus far, we conclude that Local 1's Executive Board enacted valid, bona fide resolutions concerning Bender's salary, which were not irregular in any significant fashion except that they were contingent on the local obtaining funds it did not then possess. This contingency was necessary in view of the local's financial condition and the Executive Board's duty not to impair its financial situation; the contingency was also reasonable in light of breakthroughs in union membership Bender was hopeful of accomplishing. There was adequate consideration for Bender's salary in view of the work he performed for Local 1. The contingent liability was transferred in precisely its same fashion to Local 107 upon the merger of those two organizations, but the merger did not create any liability on the part of the International because of a defense arising under the IBT constitution.

Therefore, upon the merger order in July, 1975, Local 107 became liable for Bender's salary up to that date *"when and if Local 107 came to have the ability to pay."* As to salary to Bender after the point of merger, since Local 107 was the successor organization, it could determine Bender's future employment. It chose not to employ him. Since his was an oral employment contract terminable at will, there can be no salary liability after July 21, 1975, the date on which the merger of Local 1 and Local 107 became effective and Bender was discharged from employment. *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974) (upholding at-will termination of employment).[11] Since we have found that Local 107 does have the ability to pay, thus satisfying the condition precedent, we conclude that Local 107 is liable to Bender for salary, in accordance with Local 1's resolutions, from 1972 to the date of the order merging Local 1 into Local 107, July 21, 1975.

We compute the amount of salary owed as follows: $10,000 for 1972 plus $10,000 for 1973 plus $12,500 for 1974 plus $8,301.37 for 1975 (an annual rate of $15,000 through July 21, 1975) for a total of $40,801.37. As an offset, Bender was paid $2,019 in salary from Local 1 in 1975, and used another $5,500 in escrowed union dues in 1977, for a total of $7,519. (Although Bender claims only to have paid himself $4,000 from those dues, with the rest going to attorneys fees and court reporter fees connected with the instant litigation, he is accountable for the full amount of that money). Therefore, his total salary for the years in question amounts to $40,801.37 minus $7,519 or $33,-282.37, and we will enter judgment in favor of Bender against Local 107 in that amount.

### III. Defendants' Counterclaim

Defendants' counterclaim asks that we declare the merger between Local 1 and Local 107 to be legal, and further seeks an order that Local 1 turn over all union property under its control, whether tangible or intangible, to successor Local 107.

As to the first part of the counterclaim, a declaration of legality (as against the charges of illegality contained in plaintiff's amended complaints in this suit), our earlier opinion at 419 F.Supp. 263 denied plaintiff a preliminary injunction to enjoin the merger, finding on a copious record that plaintiff's probability of success on the merits of the litigation was "not high." 419 F.Supp. at 288. Plaintiff has adduced no evidence since that opinion to elevate his probability of success. We formally adopt, on final hearing, the findings of fact and

---

11. Plaintiff has sought compensation from July 21, 1975, to the present on the theory of quantum merit, *i. e.* that he conferred a benefit on Local 107 by continuing to service the former Local 1 membership. But inasmuch as the "benefit" was one Local 107 expressly sought him *not* to confer, and inasmuch as after the merger Local 107 had the legal right to prevent him from servicing that membership, we find a quasi-contract theory inappropriate to the post-merger salary claim, and conclude Bender has no right to post-merger compensation.

conclusions of law set forth on our earlier opinion and, on the basis thereof, conclude that the merger of Local 1 and Local 107 was and is valid as against an attack that the merger violated 42 U.S.C. § 1985 or the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 411(a)(2), (4), (5) and § 529, or contractual relations between the IBT and its locals or state law.[12]

■■■ The second part of defendants' counterclaim is based upon the IBT Constitution, Article X § 13, which provides:

Section 13. When the charter of a subordinate body is revoked, the subordinate body or its officers shall be required to turn over all books, documents, property and funds to the General President or his representative, or to the General Secretary-Treasurer of the International Union, and should a subordinate body secede, disaffiliate, or dissolve or be dissolved, or be suspended, or forfeit its charter, then all books, documents, property and funds shall likewise be turned over to the General President or his representative, or to the General Secretary-Treasurer to be held until such time as the subordinate body may be reinstated or reorganized. . . .

Although this provision does not expressly refer to "merger," we think the "be dissolved" language broad enough to cover the merging of Local 1 into Local 107 and Local 107's designation as the successor organization. Since we determine the July, 1975 merger order to have been valid, we shall order that all books, documents, property and funds under Local 1's control be turned over forthwith to the General President or General Secretary-Treasurer of the International Brotherhood of Teamsters. Alternatively, since under Pennsylvania law, 15 Purdons § 1907 discussed at pp. 982–983 *supra*, all the assets and liabilities of Local 1 are now assets and liabilities of Local 107 as a matter of law, Local 1 may choose to turn over the books, documents, property and funds to the officers of Local 107.

---

**12.** Even though in our earlier opinion we found plaintiff to have stated valid causes of action under some of these statutory and contractual protections, the absence of additions to the record means that any cognizable causes of action have failed for lack of proof.

U.S. Department of Labor
Office of Labor Management
Standards Enforcement
Washington, D.C. 20216

**FORM LM-3**

**F I L E LABOR ORGANIZATION ANNUAL REPORT**

Form approved
Office of Management & Budget
No 44 R1133

FOR USE BY LABOR ORGANIZATIONS WITH LESS THAN $30,000 IN RECEIPTS

Labor-Management Reporting and Disclosure Act of 1959, as amended, and Executive Order 11491, as amended

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT. SUBMIT THIS REPORT IN DUPLICATE.

**IMPORTANT**
If label is here
Please peel off top part
and place in same box on
text copy of form.

If label data are correct,
leave Items 4 through
8 blank.

If label data are incorrect,
complete Items 4 through 8.

AMERICAN COMMUNICATION ASSN.
Teamsters Local 1 (ACA)

MORT BORROW PRES
TEAMSTERS IND
LU 00001
4 NORTH 21 STREET
PHILADELPHIA PA 19103
CITY *PHILA* COUNTY *PHILA* STATE *PA.*

036-179
20 0

12L3

| 1. FILE NUMBER | 036 179 0 |
| 2. PERIOD COVERED | Mo. | Day | Yr. |
| From | 1 | 1 | 75 |
| Thru | 12 | 31 | 75 |

4. NAME OF LABOR ORGANIZATION (as shown on charter, constitution, etc.)
AMERICAN COMMUNICATION ASSN.

5. AFFILIATION
TEAMSTER

6. DESIGNATION (Local, Lodge, etc.)
LOCAL

7 DESIGNATION NUMBER
1

8 OFFICIAL MAILING ADDRESS (For mail to the organization):
(In care of) NAME OF PERSON
MORT BORROW William Bender

NUMBER AND STREET
4 N. 21 ST. STREET

BLDG. AND ROOM NUMBER, IF ANY

CITY *PHILA* STATE *PA.* ZIP CODE *19103*

9. Are organization records kept at the official mailing address? ☐ Yes ☐ No
If "No," show address including ZIP Code in Item 21.

During the Reporting Period Did Your Organization Directly or Indirectly:

YES NO

10. Make any loans to a business enterprise? ☐ ☒
11. Have loans totaling more than $250 to any officer, employee, or member? ☐ ☒
12. Pay any employee a total of salary, allowances and any other expenses, which, together with payments from any labor organization affiliated with it or its national, amounted to more than $10,000? ☐ ☒
13. Acquire any goods or property in any manner other than by purchase or dispose of any goods or property in any manner other than by sale? ☐ ☒
14. Create or participate in the administration of a trust or other fund or organization, a primary purpose of which is to provide benefits for members or their beneficiaries, as defined by Section 3(l) of the Act? ☐ ☒
15. Discover any loss or shortage of funds or other property? ☐ ☒
(If the answer to any of the above questions is "Yes," provide details in Item 21 See specific instructions for items which are answered "Yes")

16. A. Was your labor organization insured by a fidelity bond during the reporting period? ☐ Yes ☒ No
B. If "Yes," enter the maximum amount recoverable for loss caused by any person . . . . . $

17. Enter the date of your organization's next regular election of officers.
Month_____ Year_____

18 Did your organization have any changes in its constitution and bylaws (other than changed dues amounts) or in practices described in statements submitted with Form LM-1 or LM-1A since your organization filed Form LM-1 or most recently submitted by filing a Form LM-1A? ☐ Yes ☒ No. If "Yes," attach an updated Form LM-1A to this report, with required documents.

19 LIST OF ALL OFFICERS AND PAYMENTS TO OR FOR THEM
(If any officer was not elected at a regular election in accordance with the constitution and bylaws, explain in Item 21.)

| (A) Name & title of all officers who held office during period. | (B) Status | (C) Total payments if any Dollars | Cts |
| --- | --- | --- | --- |
| ~~MORT BORROW~~ | ~~PRES~~ | | XX |
| WILLIAM BENDER | SEC-TREAS | 2,019 | XX |
| MORT BORROW | PRES | | XX |
| | | | XX |
| | | | XX |
| | | | XX |
| | | | XX |

20. List fees and dues required (Complete each line. Enter "None" or "Not applicable" as appropriate).

| | (A) If one rate applies, enter here | (B) If more than one rate applies, enter here |
| --- | --- | --- |
| | | Minimum — Maximum |
| (1) Initiation fee or fees required from new members | $ | $ |
| (2) Fees other than dues required from transfer members | $ | $ |
| (3) Are work permits issued? ☐ Yes ☐ No | | |
| (4) Regular dues or fees or other periodic payments required to remain a member of the reporting labor organization (per year, mo., etc.) | $_____ per | $_____ per |

RECEIVED
U.S. DEPARTMENT OF LABOR
LABOR MANAGEMENT SERVICES
ADMINISTRATION

21. ADDITIONAL INFORMATION (If this is a terminal report, see Section VIII of the instructions)

Item Number

MAY 20 1976
AM 7,8,9,10,11,12,1,2,3,4,5,6 PM

(If more space is needed, attach additional sheets with further statement, properly identified.)

| FINANCIAL DETAILS | (A) Start of report period Dollars | Cts | (B) End of report period Dollars | Cts | FINANCIAL DETAILS | End of report period Dollars | Cts |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ASSETS OWNED | | | | | CASH RECEIVED DURING THE REPORT PERIOD | | |
| 22. Cash on Hand and on Deposit | $ 208 | XX | $ 103 | XX | 34. Dues | $7537 | XX |
| 23. Loans and Notes Receivable | | XX | | XX | 35. Fees, Fines, Assessments, Work Permits | 1034 | XX |
| 24. U.S. Treasury Securities | | XX | | XX | 36. Other Receipts | 543 | XX |
| 25. Land and Buildings | | XX | | XX | 37. Total Receipts (Add 34 thru 36) | $9114 | XX |
| 26. Other Investments | | XX | | XX | CASH PAID OUT DURING THE REPORT PERIOD | | |
| 27. Other Assets | | XX | | XX | 38. Affiliation Payments (Per Capita Tax, etc.) | $1878 | XX |
| 28. Total Assets (Add 22 thru 27) | $ 208 | XX | $ 103 | XX | 39. Payments to Officers | 2019 | XX |
| DEBTS OWED | | | | | 40. Payments to Employees | | XX |
| 29. Accounts and Bills Payable | $ | XX | $ | XX | 41. Office and Administrative Expense | 5322 | XX |
| 30. Loans and Notes Payable | | XX | | XX | 42. Payments for Benefits | | XX |
| 31. Mortgages Payable | | XX | | XX | 43. Loans Made by Your Organization | | XX |
| 32. Other Debts | | XX | | XX | 44. Other Disbursements | | XX |
| 33. Total Debts (Add 29 thru 32) | $ N O | XX | $ N E | XX | 45. Total Cash Paid Out (Add 38 thru 44) | $9219 | XX |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under applicable penalties of law,* that all of the information submitted in this report (including the information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned's knowledge and belief, true, correct and complete.

46. SIGNED: *Mort Borrow* — PRESIDENT
(If other title, cross out and write in correct title above Explain in Item 21)
at: *PHILA PA* City *5/18/76* State Date
D - IBT 27

47. SIGNED: *William Bender Secretary* — TREASURER
(If other title, cross out and write in correct title above Explain in Item 21)
at: *Philadelphia Pa* on *5/18/76*
(215) LO 4-1251
Telephone No (Include Area Code)