## Sutch's Estate (No. 1).

|201|305|
|201|317|
| 201 | 305 |
| 20 SC | 124 |
| 20 SC | [2]254 |
| 201 | 305 |
| 28 SC [4] | 34 |
| 201 | 305 |
| 30 SC | [2]144 |
| 201 | 305 |
| 33 SC | [2]593 |
| 201 | 305 |
| 35 SC | [2]438 |

*Evidence—Cross-examination—Trial—Practice, C. P.*

Where a witness is called for the sole purpose of testifying as a subscribing witness to a signature, it is improper to permit the adverse party to bring out his case on cross-examination of the witness. If, however, the witness is subsequently called by the adverse party and testifies to the same matters which were drawn out on his cross-examination, no harm is done.

*Evidence—Parol evidence— Promissory note.*

Parol evidence is admissible of a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change, or reform the instrument; but such oral agreement must be shown by evidence that is clear, precise and indubitable.

*Expense—Parol evidence—Promissory note—Parents and children.*

Where two children work for their father many years after their majority, without pay, and the father about the time of his second marriage gives them promissory notes thus recognizing his indebtedness to them, and there is no evidence of fraud, accident, mistake, duress or undue influence,

the second wife cannot by the evidence of one person, and that vague in its terms, prove an alleged parol contemporaneous agreement that the notes should only be used if the father disinherited his children, and that as the father died intestate the purpose of the notes was fully accomplished, and their attempted collection was a fraud upon the widow.

*Evidence—Parol evidence—Reformation of written instrument.*

A chancellor invariably refuses to reform a written instrument on the uncorroborated testimony of a single witness.

*Promissory notes — Consideration—Moral consideration — Parent and child.*

Past services rendered by children to their father after their majority are a good consideration for promissory notes given by the father to the children.

Argued Oct. 28, 1901. Appeal, No. 13, Oct. T., 1901, by John Z. Sutch, from decree of O. C. Allegheny Co., Sept. Term, 1898, No. 140, overruling exceptions to adjudication in the Estate or James Sutch, Deceased. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Reversed.

Exceptions to adjudication.

Hawkins, P. J., stated the facts to be as follows:

Claims on notes for $2,000 each were presented by John Sutch and Mrs. Hasley, two of decedent's children, to which objections were made; and thereupon a subscribing witness, H. L. King, who was also attorney for James Sutch, was called in their behalf. He testified, inter alia : "Mr. Sutch came in himself first and stated that since he was married (the second time) his son and daughter were afraid of being disinherited; that was in July, I think. Afterward Mr. Sutch and his son came in; they talked the matter over as to whether arrangements could not be made so that they would be sure they would not be disinherited. It was suggested that certain sums of the Callery mortgage be assigned. I think the son made this suggestion. I advised an agreement; but the agreement did not suit them; the son said it could be changed and Mr. Sutch said he wanted to have control of his property as long as he lived. I suggested that a will be made; but the son said a new will could be made afterward. It was then decided to make these notes; and they would hold them as security

against being disinherited; that when he, Mr. Sutch, received the Callery mortgage he would loan them money to buy property and they must pay him the interest. He wanted them to invest in property and he would give them the first mortgage and they were not to enter these notes. This was to give him peace of mind. There was nothing said about this $2,000 being in full of any claim of John Sutch when he was present. He said they troubled him so much; and he did not know why they thought he would disinherit them. When it was suggested that an article of agreement be gotten up John Sutch said his father might die and he would have trouble in proving the agreement. He would rather have something more substantial. The old gentleman said if they were satisfied he would give them the judgment notes until he got the Callery mortgage and then he would make arrangements with them; they could buy property; he would loan them the money; and they would pay him the interest. John Z. Sutch was present when it was stated that these notes were not to be entered up. He assented to it." In the various conversations which led up to the signing of these notes no suggestion was made by John Z. Sutch that he had any claim against his father's estate for work. The only thing was when John Sutch was in himself stating that he thought his father ought to do something for him, that he worked for him after he was of age, and he was afraid now he would disinherit him. I told him he would not do that, that he only wanted to do what was right. Mrs. Hasley was not present at any of these conversations. After James Sutch signed this note of John Z. Sutch, he said he would tell his daughter about this, and that I would better write another note out for her. He said I will tell her about it, I want to treat them both alike. He did not at any time say that $2,000 was in full for their share in his estate. They were given to satisfy them that they would not be disinherited until he could make arrangement with them after he got his money; then he would make a will. John Z. Sutch was called in his own behalf in the first instance, but objection having been made he was rejected on the ground of incompetency. The court (HAWKINS, P. J.), without filing an opinion, made distribution under the intestate laws. At a rehearing before OVER, A. J., the claimants attempted, (1) to contradict their

witness H. L. King, in respect of the purpose of the arrange-
ment; and (2) to show that the consideration of the notes
given was services rendered by them. In respect of the first
offer, John Z. Sutch, who was admitted under objection as to
competency, denied that inheritance was an element in the ar-
rangement made, or that there was any provision made by him
not to enter his note. In respect of the second offer, the evi-
dence adduced showed that these two children continued for
some years after attaining their majority as part of the family
of James Sutch, faithfully assisting in work in the house and
garden work which was arduous, John sometimes, however,
going out to work for strangers. There is no pretense that
any contract was made for wages, and none were paid; but
they were maintained as they had been before; and no break
in the harmony of the family seems to have arisen until after
Mr. Sutch's second marriage. Mr. King testified at the rehear-
ing that something was said about James Sutch "getting mar-
ried; and they (the children) were afraid of this second
woman," Mr. Sutch complained that the "children were forc-
ing him . . . . were continously after him. When I give them
these notes we will have peace and when I get the money (or
Callery mortgage) I will make an arrangement." "I have
concluded—we have talked the matter over" he said at his in-
terview with John "to give them a note to hold as security
until I get the money on the Callery mortgage, that I wouldn't
make a will and disinherit them; and when we get the Callery
mortgage it is time to make a division. In the meantime if I
can get any property . . . . I will advance the money if they
will pay me interest; I don't want to part with the interest on
my money." The total value of Mr. Sutch's estate was $7,000.

The court ruled out the notes.

*Errors assigned* were (1) in permitting H. L. King on cross-
examination to testify to matters not asked in direct examina-
tion; (2) in permitting H. L. King to put in the defense upon
cross-examination under objections; (3) in holding that the
claimant was precluded by the hostile testimony of H. L.
King, because said King was called by claimant as the sub-
scribing witness, to prove the execution of the note; (4) in
holding that there was a parol agreement between claimant

and decedent which rendered the note null and void as an evidence of debt; (5) in holding that there was evidence of fraud against the widow; (6) in not allowing the claimant the full amount of the claim with interest.

*E. E. Fulmer*, with him *W. I. Craig* and *Howard Zacharias* for appellant.—A chancellor invariably refuses to decree on the uncorroborated testimony of a single witness: Brawdy v. Brawdy, 7 Pa. 157; Phillips v. Meily, 106 Pa. 544; North v. Williams, 120 Pa. 109; Thomas v. Loose, 114 Pa. 35; Jones v. Backus, 114 Pa. 120; Jackson v. Payne, 114 Pa. 67; English's Appeal, 119 Pa. 533.

The learned judge seems to have fallen into the error of holding that the claimant having called Mr. King as his own witness, is precluded by his testimony. Mr. King was the only subscribing witness to the note and as such he was obliged to call him, but being manifestly hostile he cannot properly be considered to be his witness and is not precluded by his testimony: Cowden v. Reynolds, 12 S. & R. 283; 1 Greenleaf on Evidence, sec. 443.

The learned court erred in permitting Mr. King to produce the whole of the defense upon cross-examination, under the circumstances, under objection by claimant: Irvin v. Irvin, 142 Pa. 286.

As to the question of consideration it has long been held that want of consideration is not a defense to a bond or note under seal executed and delivered. The seal implies consideration: Anderson v. Best, 176 Pa. 498; Burkholder v. Plank, 69 Pa. 225; Rishel v. Crouse, 162 Pa. 3. But the claimant, though not obliged to do so, has shown, by competent testimony, good consideration for the note in that he spent perhaps the best years of his life on the little farm working for the family.

*Edward F. Duffy*, for appellee.—The law implies no contract between the decedent and the appellants to compensate the latter for services rendered by them or for boarding; the burden is upon them to prove conclusively such a contract: Lynn v. Lynn, 29 Pa. 369; Houck's Exr. v. Houck, 99 Pa. 552; Barhite's App., 126 Pa. 406; Weaver's Estate, 182 Pa. 349;

Mueller's Estate, 159 Pa. 590; Zimmerman v. Zimmerman, 129 Pa. 229.

The law is well settled that where there is fraud, parol evidence is admissible to explain, modify or reform, and even utterly destroy written instruments under seal: Hoopes v. Beale, 90 Pa. 82; Schweyer v. Walbert, 190 Pa. 334; Greenawalt v. Kohne, 85 Pa. 369; Graver v. Scott, 80 Pa. 94; Lippincott v. Whitman, 83 Pa. 244; Honesdale Glass Co. v. Storms, 125 Pa. 268.

The testimony of one witness (especially the one who wrote the contract) is sufficient in the absence of testimony to the contrary, to establish a contemporaneous agreement, and this even among strangers': Real Est. Title, etc., Co.'s App., 125 Pa. 549; Miller v. Henderson, 10 S. &. R. 290; Schafter v. Clark, 90 Pa. 94; Prowattain v. Tindall, 80 Pa. 295.

The burden is upon these appellants to show that the transaction between themselves and their father, wherein they seek to benefit themselves and deprive the widow and infant child of their rightful share of the estate, was fair and conscientious and beyond the reach of suspicion; Darlington's App., 147 Pa. 624; Corothers v. Corothers, 149 Pa. 201; Darlington's Appeal, 86 Pa. 512; Miskey's App., 107 Pa. 611; Worrall's App., 110 Pa. 349; Unruh v. Lukens, 166 Pa. 324.

OPINION BY MR. JUSTICE DEAN, January 6, 1902:

On August 9, 1894, James Sutch the father of John Z., this appellant, executed two judgment notes under seal, each in the sum of $2,000 payable one year after date without interest, respectively to his two children, John Z. Sutch and Renna Hasley. The two payees were children of a first wife and the notes were made and delivered a short time after his marriage to his second wife. The father had property real and personal to the value of over $7,000. The realty consisted of a small · truck farm within the municipal boundaries of Pittsburg. The family at first consisted of the father, mother and three children, two daughters, Georgie and Renna, and one son John Z. Sutch, this appellant. The mother and daughter Georgie, were for many years invalids and unable to work—the daughter Georgie died about 1887 and the mother about four years later. The produce of the truck farm was somewhat abundant.

It afforded a comfortable support for all the family, besides considerable money was yearly saved, which was used to clear the farm from a debt proportionately large for its value. The father and the two well children did all the work on the farm and in the house. Both children worked without wages as, members of the father's family. After the death of the mother both John and Renna married. John was then thirty-six years of age and Renna twenty-two. In about three years after his first wife's death the father married a second time. Before the marriage he had conversations with both his children on the subject of paying or compensating them, which soon after his marriage resulted in his giving them the notes referred to. The father died intestate May 5, 1897, leaving a widow, Mary A. Sutch, the second wife, and an infant daughter by her. The widow who had taken out letters of administration in September, 1898, filed her first and final account. On distribution the payment of the two notes was objected to by her on the grounds, first, that they were given by the father in collusion with the two payees to defraud the widow and child, and second, that they had been extorted from him by them by undue influence and were not to be collected if he died intestate. Much evidence was taken in the orphans' court bearing on both questions. The learned judge of that court was of opinion, that the evidence showed a mixture of fraud and undue influence in the giving and obtaining the notes and the present attempt to collect them, and therefore disregarded them in the distribution and distributed the balance on the account under the intestate laws of the commonwealth. From this decree John Z. Sutch brings this appeal, assigning seven errors. The first three are to the admission of the testimony of H. L. King concerning the merits of the defense set up by the administratrix, when he had only been called by the claimant, John Z. Sutch, to testify as a subscribing witness to the signature of the father to the note. It was irregular to allow counsel for the widow to bring out her case on cross-examination of this witness. Mr. King was only called to prove the genuineness of the signature; but on cross-examination the opposing counsel was permitted to examine on matters entirely outside the signature; in fact the signature was not disputed; it was alleged, however, it was made by the father

with intent to defraud his wife, and to this he was moved by the importunities and undue influence of his children; that there was no intention that the notes should evidence a present debt, but that they should stand as a barrier only, against any future attempt to disinherit the children by will in favor of the second wife. This was the whole case of the second wife, and King's was the only testimony which at all attempted to establish it. She should have called King as her witness. John Z. Sutch called him as a subscribing witness when he presented the note and he was bound to do so; but he was his witness no further and he was not further bound by his testimony. Cowden v. Reynolds, 12 S. & R. 283; Greenleaf on Evidence, sec. 443. But King was a competent witness; the other side subsequently did call him, and in substance, he testified to the same facts which he had narrated when called as a subscribing witness. So the irregularity attending his evidence when first given did the claimant no harm.

The other four assignments are all practically embraced in the fourth as follows: "The court erred in holding that there was a parol agreement between claimant and decedent which rendered the note null and void as an evidence of debt." The learned judge in his reasoning, starts with the legal presumption, that without regard to the value of the service rendered by the son to the father for the fifteen years after he became of age or on the fidelity of his services in his minority, yet having been rendered while living in his father's house as a member of the family, in the absence of a special contract, there was no legal obligation on the part of the father to pay for them; the son during that period got his boarding and clothes and it is to be presumed that was, in contemplation of both parties, sufficient compensation. He is further of opinion, that in an estate of such value, $7,000, it is incredible the father should have practically ignored the claims of his wife and infant child; that the law of self-preservation and filial duty was inconsistent with the enforcement of these notes. That the testimony of the subscribing witness King and the circumstances in which the parties were placed seemed to supply the measure of proof required to move the hand of a chancellor to restrain collection.

We cannot agree with the learned judge either in his reasoning or in the conclusion to which it impelled him. Here were

two men, both of sound mind, who from the testimony on both sides thoroughly understood the purport and effect of a plain contract obligation. The obligor makes and delivers to the obligee this writing : " One year after date I promise to pay to John Z. Sutch two thousand dollars without defalcation for value received, without interest." This is signed by the obligor who also affixes his seal. There was no fraud, accident or mistake in the creation of the instrument, and as the court below correctly states, " The pivotal question then here is, whether sufficient proof has been adduced to call for the intervention of a chancellor?" And even where there has been no fraud or mistake in the making of an instrument "an attempt by the holder to make a fraudulent use of it, as against an oral agreement with the maker and without which it would not have been delivered, will avoid it."

The English rule that parol evidence is inadmissible to vary the terms of a written instrument has long since been departed from in this state ; and since that departure a constant temptation has existed to change the terms of a writing by any and all kinds of evidence, to reach equity, or what is fancied to be equity, between the parties. But this court has never incidentally said, that slight evidence or circumstances indicating hardship to the obligor, much less has it so decided, are sufficient to warrant a departure from the rule. The rule in this state, as we have endeavored to adhere to it, is comprehensively announced thus, in Thomas & Sons v. Loose, 114 Pa. 35 : " Parol evidence is admissible of a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change or reform the instrument. It has often been said that such oral agreement must be shown by evidence that is clear, precise and indubitable." To the same effect are Phillips v. Meily, 106 Pa. 536, North v. Williams, 120 Pa. 109, Jones v. Backus, 114 Pa. 120, and many other cases. Is there here any such clear, precise and indubitable evidence, either as to undue influence or as to an attempt to use the note for a purpose other than that expressed on its face ? Take the oral testimony of King, the only witness called by the widow : he says that the father and son came to his office at least twice together, the witness being counsel for the father ; that they talked the matter over as to whether arrangements could be

made so that the two children would not be disinherited; the son suggested an assignment by the father of what was known to be the Callery mortgage; the attorney advised an agreement (presumably) in writing; the father said he wanted control of his own property as long as he lived; the attorney then suggested that a will be executed; the son said a will could be revoked or changed; the attorney then suggested that these notes be made, and the father said when he received the Callery mortgage then he would make arrangements with them and then would make a will. This is the substance of King's testimony. According to it, there was not a word said by either of any intention to defraud the wife; the intention at most as expressed by both was to save the two children from being wronged or defrauded by a possible subsequent will in favor of the wife. It is argued the notes were without consideration; this is a mistake; the children had no claim which they could have enforced at law; both they and their father fully understood this; had it been otherwise, neither they nor their father would have been in the office of the father's attorney that morning to put their claim in such shape that it could be enforced; but they asserted and he admitted a moral obligation on his part to compensate them for long and faithful service. The son had remained working for him without wages for fifteen years after he became of age; the daughter had performed without help all the household duties; had faithfully nursed her invalid sister and mother through years of illness until their death; both had done all they could to save their father's heavily incumbered property. They thought their father indebted especially to them; they saw the new wife step into their mother's place, and a possible new family about to enjoy the fruits of their labor. Of course they expressed to their father a desire for compensation; he, conscious of their deserts, conceded the justice of their claim. He was not legally bound to pay them anything, but if he chose to consider that he in conscience owed them, the moral debt was a good consideration for the legal promise expressed in the notes. In this there is not a spark of evidence to indicate any collusion or intention to defraud the wife or any other person. The father many times both before and after giving the notes distinctly declared to different neighbors, who so testify, that he would

not wrong or defraud his children but would pay them. And certainly his reputable counsel, Mr. King, the only witness called by the widow, did not suggest the giving of the notes to aid the father and children to defraud the father's wife. There was no undue influence used to get the notes nor any attempt to defraud. It may be the father intended not to die intestate, but by a subsequent will to provide better for the wife, and that his sudden and unexpected death frustrated his intention; but for that the children are not answerable.

But, it is further argued, that the notes were given and accepted only to prevent disinheritance by will, and as the father died intestate, their purpose was fully accomplished and the attempt now to collect them from the estate is a fraudulent use of them. The testimony of King on the point, is by no means clear; he says, the son and daughter were afraid of being disinherited and that the father gave them the notes to secure peace; at the same time, the father said when he got the Callery mortgage he would arrange with them; he, King, then suggested and drew the notes which were delivered. It is to be presumed that the lawyer for the protection of his client made some attempt to express the real intention in the notes; they are payable absolutely one year after date without interest; not payable on the collection of the Callery mortgage; not payable at death of obligor in case he disinherited the children; they evidence a present debt, payable one year after date. The son, John Z. Sutch, and the daughter, Renna Hasley, both testify positively that the two notes were not given to protect them from disinheritance, but they were to be paid when the Callery mortgage was collected. Assuming the law to be with the widow, and that it could be invoked to prevent a fraudulent use of the notes, there is an utter absence of that clear, precise and indubitable evidence, which would move a chancellor to restrain their collection. King's evidence is ambiguous and to some extent improbable; it is inconsistent with his own statement of the father's declarations when he signed the notes; to some extent improbable, if he be, as we have no reason to doubt, a reputable counsellor at law seeking to protect his client from further litigation; it is flatly contradicted by the testimony of John Z. Sutch and Renna Hasley. No conjectural hardship could condone a chancellor's reformation of this contract on such vague, uncertain and very doubtful evidence.

But there is another and insuperable obstacle to sustaining the decree of the court below. A chancellor invariably refuses to reform a written instrument on the uncorroborated testimony of a single witness: Brawdy v. Brawdy, 7 Pa. 157; Phillips v. Meily, 106 Pa. 536. Here the defense set up is purely equitable; it is an attempt to reform a written instrument. If John Z. Sutch had brought suit on this note in a common-law court and the same evidence had been offered as a defense to it, that of King, the judge sitting as a chancellor, to administer equity through common-law forms, would have been bound to instruct the jury, that on the uncorroborated testimony of King, the defense could not prevail and they must render a verdict for plaintiff. For King's testimony is not corroborated as alleged by circumstances. The circumstances pointed to are, that James Sutch was not legally bound to compensate his children. As we have already noted, that was a question for himself; if he felt that he ought to in fairness and justice compensate them, that was no concern of his wife's; he could turn the moral obligation into a legal one as he did by giving the notes. Again it is said the children by the notes get a disproportionately large share of the estate and this is a grievous hardship to the widow and young children, but this is not corroborative of King; it has no connection with the contract as evidenced by the notes; it is a hardship in one sense on any widow, to appropriate the bulk of the husband's estate in payment of his debts, but the hardship is not a circumstance corroborative of an allegation that the debts are fraudulent. We think the court erred in restraining the collection of the note of John Z. Sutch. Therefore its decree is reversed and it is ordered that distribution be made in accordance with this opinion.