William BENDER

v.

**HIGHWAY TRUCK DRIVERS AND HELPERS LOCAL 107.**

Civ. A. No. 80–0534.

United States District Court,
E.D. Pennsylvania.

Nov. 19, 1984.

Harry Lore, Philadelphia, Pa., for plaintiff.

William Einhorn, Cheltenham, Pa., for defendant.

## MEMORANDUM OF DECISION

SHAPIRO, District Judge.

This action is the penultimate phase of the litigation arising from the decision of the General Executive Board ("GEB"), International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT") to merge Local 1 (ACA) Broadcast Employees of the IBT ("Local 1") into the Highway Truck Drivers and Helpers Local 107 ("Local 107"). Prior to the merger, Local 1 was a small local union predominantly representing workers in the radio broadcast and insurance industries whose members were citizens of New York and Pennsylvania. William Bender, former Secretary-Treasurer, Business Agent, and Chief Executive Officer of Local 1, was and is a citizen of New York. Local 107 is a large union predominately representing truck drivers that, in July 1975, had no active members who were citizens of New York.

In an earlier phase of this litigation, Bender and Local 1 filed suit against IBT and Local 107 to enjoin the GEB's merger order. Additionally, Bender appended a claim against IBT and Local 107 for salary allegedly owed him for services he rendered to Local 1's membership both before and after the merger order. IBT counterclaimed for enforcement of the merger order. The Honorable Edward R. Becker, then a judge of this court,[1] denied plaintiff's motion for a preliminary injunction against the merger order on March 26, 1976. *Local No. 1 (ACA), et al. v. International Brotherhood of Teamsters, et al.*, 419 F.Supp. 263, 269 (E.D.Pa.1976).

Following trial on the merits, Judge Becker made his denial of an injunction against the merger order final and entered judgment to enforce it. On Bender's pendent claim for salary, the court held Local 107 liable as the successor union for Bender's salary for work performed for Local 1 prior to the merger but denied Bender recovery of any salary for post-merger services. *Local No. 1 (ACA), William Bender, et al. v. International Brotherhood of Teamsters, Local 107, et al.*, 461 F.Supp. 961 (E.D.Pa.1978).

A series of cross-appeals followed: Local 1 and Bender appealed the court's denial of injunctive relief; Bender appealed the court's denial of any post-merger salary; and Local 107 cross-appealed the court's salary award for pre-merger services. The Court of Appeals affirmed the validity of the GEB's merger order. However, it held there was no pendent jurisdiction over Bender's salary claim and vacated the salary judgments. *Local No. 1 (ACA), William Bender, et al. v. International Brotherhood of Teamsters, Local 107, et al.*, 614 F.2d 846 (3d Cir.1980).

Following its partial vacation of Judge Becker's 1978 decision, the Court of Ap-

---

1. The Honorable Edward R. Becker was elevated to the Court of Appeals for the Third Circuit on December 3, 1981.

peals granted Bender's motion to amend his pleadings under 28 U.S.C. § 1653 to allege diversity of citizenship as the jurisdictional basis for his salary claim. *Id.* at 852–53 (as amended February 26, 1980). Bender then amended his original action (Civil Action No. 75–2684) by dropping the merger claim. Bender also re-filed his salary claim in a new action against Local 107 only (Civil Action No. 80–534). On July 27, 1982, Judge Becker held that Bender could not drop the merger claim to create diversity jurisdiction at such a late date. But Judge Becker permitted the new action; since Bender had never become a member of Local 107, there was complete diversity between Bender and Local 107 in 1980 when the new action was commenced. *Local No. 1 (ACA), et al. v. International Brotherhood of Teamsters, et al.*, (Civil Action No. 76–6284) and *William Bender v. Highway Truck Drivers and Helpers Local 107*, (Civil Action No. 80–534), 543 F.Supp. 1321 (E.D.Pa.1982). This case, *William Bender v. Highway Truck Drivers and Helpers Local 107*, Civil Action No. 80–534, was transferred to the docket of this court on April 10, 1983. Now before this court is Bender's 1980 action against Local 107 as Local 1's successor union for salary allegedly owed him for servicing the Local 1 membership. Also before this court is Local 107's counterclaim, asserting that Bender must reimburse Local 107 both for salary he paid himself and for all expenditures he made on behalf of Local 1 subsequent to July 21, 1975, when IBT ordered Local 1 merged into Local 107.

To understand the claims asserted by both sides, the allegations are summarized according to the relevant time periods.

*Period I: January 1, 1972—July 21, 1975*

This is the period prior to merger when Local 1 did not pay Bender. (Bender was paid $200 per week from his election as Secretary-Treasurer and member of the Lo-

cal 1 Executive Board in May, 1971 through December, 1971.) In both 1974 and 1975, Local 1's Executive Board voted to pay Bender a salary for 1972–75 "when and if" Local 1 obtained the money. It is undisputed that Local 1 never had sufficient funds to pay Bender any salary prior to its merger with Local 107.

Bender asserts that the Local 1 Executive Board resolutions imposed an obligation to pay his 1972–75 salary, amounting to $40,801.37, on Local 1 and Local 107, its financially solvent successor. Local 107 contends that Local 1's actions were procedurally irregular and cannot bind Local 107.

*Period II: July 21, 1975—November 8, 1978*

This is the interval between the IBT order that Locals 1 and 107 be merged and the district court decision upholding the validity of the merger. During this time, Bender used funds of the former Local 1 [2] to finance litigation aimed at invalidating the merger, pay himself a salary of $7,591.68, and pay other Local 1 expenses (e.g., rent, telephone). Local 107 counterclaims for these and any other expenditures on the grounds that following the merger order, Local 1 of the IBT ceased to have a legal existence. Furthermore, Local 107 asserts that Bender was not authorized to expend funds on behalf of Local 1 members, as Local 107 had expressly ordered Bender not to continue servicing the Local 1 membership. Bender contends that the legal status of Local 1 was in doubt until the court ruled on the merits of the merger order.

*Period III: November 8, 1978—Present*

This period is not covered by the present claims. Judge Becker's November 8, 1978 order required Bender to turn over all property and funds under Local 1's control to IBT or Local 107. On October 5, 1982, Judge Becker held Bender in contempt and ordered him to pay $2,968.26 to Local 107

---

**2.** After the July 21, 1975 merger, Local 1 (ACA), affiliated with the Teamsters, ceased to exist. However, because Bender continued to head an association of members of this union, we will

continue to refer to this group as Local 1 but it is now understood to mean "Local 1 unaffiliated with the IBT."

within thirty (30) days to purge himself. *See* Memorandum dated September 11, 1982 and Order dated October 5, 1982. Following his unsuccessful appeal, Bender satisfied this judgment. On October 23, 1983, Local 107 acknowledged receipt of Bender's check for $2,968.26; its petition for attorneys' fees in connection with the contempt proceedings is pending.

This Opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The findings of fact in Judge Becker's 1976 and 1982 Opinions as well as the Court of Appeals' 1980 Opinion are *res judicata* and, where relevant, are relied on by this court. The record before this court for Period I is identical to the record that was before Judge Becker in his vacated 1978 Opinion. We will quote his Opinion where, following our independent determination, we agree with his thorough and thoughtful analysis of the relevant considerations. The record before this court for Period II includes additional documents as stipulated by the parties: Documents attached to the Affidavit of William J. Einhorn, submitted in support of defendant's Cross-Motion for Summary Judgment Dismissing Plaintiff's Complaint and Granting it Judgment on its Counterclaim, and labeled Exhibits A, B, and C. This court's findings are based on this record and statements of counsel at closing arguments before this court on January 13, 1984.

## FINDINGS OF FACT

This court finds that:

*Period I:* Bender is entitled to salary of $40,801.37 for services rendered the membership of Local 1 from January 1, 1972 through July 21, 1975.

*Period II:* Since an International union may exert substantial authority over its subordinate locals (including the power to order mergers), Bender had no right to take actions and make expenditures on behalf of Local 1 subsequent to the July 21, 1975 merger order. Accordingly, $15,-837.73 is a set-off to Bender's salary award; this represents all post-July 21, 1975 expenditures on behalf of Local 1, its officers, and its litigation, with the sole exception of dues paid to the International union on behalf of members of Local 1 (regarded by the International union as due payments on behalf of new Local 107 members).

*Period I: January 1, 1972—July 1975 William Bender's Salary Claim*

The relevant history is summarized in Judge Becker's 1976 Opinion.[3] Local 1 was originally affiliated with the American Communications Association ("ACA"), "a labor organization which pioneered in the representation of employees in the radio broadcast industry," in the 1930's and 1940's. 419 F.Supp. at 277. However, the ACA subsequently came upon "hard times" and, in 1966, sought affiliation with the large IBT. At that time, the ACA consisted of four local unions; Local 1 was the smallest, with only 50 members.[4] "Local 1's IBT charter application was filed on November 2, 1966. The signers, including ... Bender, pledged themselves 'to be governed by the International Constitution.' Local 1's charter was granted on November 15, 1966. The charter contract, signed on April 21, 1967, on behalf of Local 1 ... obligated Local 1 to 'abide by the provisions of the International Constitution.'" 419 F.Supp. at 278.

Following affiliation, Bender worked as an organizer, particularly directing his energies to the insurance industry. Bender successfully organized a small number of insurance industry employees; however, for a variety of reasons, *see* 419 F.Supp. at 279, his efforts resulted in few new Local 1 members. Local 1's membership during

---

**3.** We quote liberally from that *res judicata* Opinion. Its primary thrust concerned the historical relationship among the IBT, Local I, and Local 107. Since the IBT is not a party to this action, we do not consider this aspect of Local 1's history but refer those interested to 419 F.Supp.

263 (E.D.Pa., op. June 21 as amended August 12, 1976).

**4.** Local 1 had 900 members in the early 1940's. 419 F.Supp. at 278 n. 29.

1967–1972 never rose above 115. Judge Becker found that,

In the wake of these developments, Local 1 has remained a tiny local union whose resources are as limited as its membership. Local 1 had been in poor financial condition since affiliation. It had no paid employees between November 1966 and May 1971. Although Local 1 paid plaintiff Bender a salary from May 1971 to December 1971, it was not able to continue these payments and has had no paid full-time representative since that time. It owes the Eastern Conference of Teamsters money for printing authorization cards, a debt it has been unable to pay since incurred in 1972. It had assets in 1972 of approximately $1,000.

Local 1's shortcomings have not been only financial. The local has also suffered from a bifurcation of its internal operations, a tale of two cities, as it were. For, while the local's office is in Philadelphia, most of its members, including Bender, live and work in metropolitan New York. Local 1 has failed to hold monthly membership meetings as required by the IBT Constitution Art. XVI, § 2(a)(1), probably for that reason, and its executive board meetings were held in a strange way: two members would meet in Philadelphia one day and three in New York the next (with Bender).[5] Moreover, an audit report prepared for the IBT showed, *inter alia*, that Local 1 failed to adopt bylaws, as required by the IBT Constitution, Art. XXII, § 1, and that the local was late in paying per capita sums due the IBT, the Eastern Conference, and the Joint Council, and in filing required trustee reports. These problems did not prevent Bender, a most dedicated man, from servicing the membership, and at no time has there been any complaint by members of Local 1 regarding servicing, negotiation of collective bargaining agreements, or the performance of duties by Bender. On the other hand, the local's viability is at best marginal, and, in view of its financial difficulties, it lacks the capacity effectively to organize its jurisdiction.

419 F.Supp. at 279–80 (footnote omitted).

Local 1's small size and financial condition made it a likely candidate for merger. As Judge Becker related,

In the latter part of 1972, General Secretary-Treasurer Miller began a review of local unions with memberships of under 100 to determine whether to recommend a merger. A review of the situation of Local 1 revealed its small membership and poor financial condition, its inability to maintain a full-time, paid representative, its late per capita payments, its failure to adopt bylaws, and its failure to hold regular monthly membership meetings.... [Miller] brought the matter to the attention of the GEB at one of its quarterly meetings, held on July 17–20, 1973. He recommended that Local 1 be merged because of its small size, poor financial condition, failure to adopt bylaws, failure to hold regular monthly meetings, inability to maintain a full-time paid representative, and lateness in per capita payments. At its session of July 18, 1973, the GEB voted unanimously in favor of merger of Local 1 into an appropriate local union for the reasons advanced by Miller.

Implementation of the decision to merge Local 1 traveled a more troubled course. On July 27, 1973, Miller wrote Treretola, directing him to implement the Board decision by finding a local with which to merge Local 1....

On April 1, 1974, Treretola wrote Miller that he was unable to find a local willing to merge with Local 1. On April 30, 1974, Treretola moved before the GEB to disolve Local 1's charter, but then withdrew his motion.... [T]his motion was made solely because of difficulty in finding an accommodating local union into which Local 1 could merge. On

---

**5.** This statement appears to be incorrect. Seven members of Local 1 were on its Executive Board, as required by the IBT constitution.

May 2, 1974, the GEB voted to merge Locals 1 and 115. Local 115 opposed this merger. Moreover, on June 18, 1974, Local 1 and William Bender filed suit in the Court of Common Pleas of Philadelphia County to enjoin the merger. Named as defendants were the IBT, Frank E. Fitzsimmons and Edward Nangle.... [T]his lawsuit was dismissed by the court on December 31, 1974.

On January 24, 1975, after the dismissal of the state court suit, the GEB reaffirmed its decision to proceed with the Local 1's merger. Bender was notified and directed to take certain steps to facilitate an orderly merger. Bender refused to comply. Thereafter, on March 4, 1975, Bender wrote to Miller to request a stay because of an organizing drive which Bender hoped would increase the size of Local 1. On March 17, 1975, Miller wrote to Bender that the request for a stay had been denied by the GEB because no substantial reason for changing its decision had been presented. At a GEB meeting held between April 28 and May 1, 1975, the GEB once again reaffirmed its decision. On July 7, 1975, Bender wrote Miller to suggest the organizing possibilities in the insurance industry, to no avail. The GEB reviewed its previous decisions, reviewed Bender's letter and position, and concluded that Local 1's recent "organizing success" did not substantially change the situation or affect the reasons for the original merger decision.

On July 8, 1975, the GEB ordered that the previous decision merging Local 1 with Local 115 be amended to substitute Local 107 for Local 115, and Fitzsimmons wrote to Bender on July 16, 1975, notifying him of this decision. Local 107 is a large Philadelphia based local, the vast bulk of whose members are truck drivers. Local 107's recent history has been marked by internal strife, its fabric frequently tattered by violence. On July 21, 1975, Messrs. Cotter and Barlow, as representatives of the IBT, appeared in the office of Local 1 and demanded that Bender immediately turn over the local's charter, books, records, seal, bank accounts, membership lists, collective bargaining agreements, minutes, etc., and handed him two letters dated July 16, 1975, one from Murray W. Miller and the other from Frank E. Fitzsimmons. Bender continued to protest the merger. Local 107, which had a complete executive board, made no provision to include Bender thereon. On September 9, 1975, Louis J. Bottone, President of Local 107, sent out formal notification to members of Local 1 informing those who were given notice that their membership obligations would thenceforth accrue to Local 107, 'as the successor to Local 1.' This notice was followed by a certified letter on September 17, 1975, from Bottone to Local 1's members containing dues checkoff forms, personal data sheets and a membership card in defendant Local 107 with the Local 1 member's name inscribed on it. These notices were prepared by the IBT for use by Bottone. Shortly thereafter the present lawsuit [to enjoin the merger] was filed.

419 F.Supp. at 281–82 (footnotes omitted).

■ Although Local 107 was an extremely odd partner for Local 1, it was within the IBT's authority to order the merger. The Constitution and By-Laws of a union constitute a contract between the union and its membership. *See International Association of Machinists v. Gonzales*, 356 U.S. 617, 618–19, 78 S.Ct. 923, 924–25, 2 L.Ed.2d 1018 (1958). Consequently, since the IBT Constitution [6] autho-

---

**6.** Art. IX, § 11, ¶ 1 of the IBT Constitution provides:

The General Executive Board in its discretion shall have the power to merge local unions and other subordinate bodies under such terms and conditions and subject to such qualifications as the General Executive Board may determine, taking into consideration such circumstances as financial conditions, jurisdiction, location and such other factors as appear appropriate in connection with the local unions and other subordinate bodies involved.

The GEB had exercised this authority over 150 times between 1966 and 1975. Defendant's Exhibit No. 28.

rized merger of locals without their consent, the merger was valid. 614 F.2d 846, 850 (3d Cir.1980).

Bender worked without salary after January, 1972. On March 4, 1974, four members of the Local 1 Executive Board met in Philadelphia and passed the following resolution:

Motion that Brother Bender be paid back to Jan. 1972 on the basis of $10,000 per year (this shall be a liability of a Local and not of any individual member of the Executive Board) when and if the Local has the funds and $12,500 for year 1974.

Plaintiff's Exhibit No. 1a. The motion was recorded in the Minutes. Bender was present but listed as "not voting." On March 14, 1974, the three-man New York branch of the Executive Board met and with Bender apparently voting this time, adopted an identical resolution. In 1975, the Executive Board met again in split sessions (on June 17 in Philadelphia, on July 22 in New York) and unanimously voted "to approve $15,000 for year of 1975 for salary for William Bender for services." Plaintiff's Exhibit No. 1a. Passage of this resolution was recorded in the Minutes.

We agree with Judge Becker that,

The above salary resolutions constitute the basis for Bender's claim against defendant Local 107 and defendant IBT in the present suit: $10,000 for the years 1972 and 1973, $12,500 for 1974, and $15,000 for 1975.

The four resolutions contain certain ambiguities on their face. The March 4, 1974 and March 14, 1974 resolutions state that the 1972 and 1973 salaries are expressly conditioned on Local 1 obtaining sufficient funds to pay the amounts. Both resolutions are silent as to whether the 1974 salary obligation is similarly conditional. We resolve this ambiguity by finding the bifurcated Executive Board, voting on March 4, 1974 and March 14, 1974, intended that the 1974 salary was to be conditional on the local

obtaining sufficient funds. We base this finding on our inference from the entire record: The Executive Board of Local 1 was scrupulous, during the entire period 1971–75, to conserve the slender resources of Local 1, and not to take any actions in violation of its fiduciary duty as officers of the local. . . . To have approved the 1974 resolutions without the contingency would have been in gross disregard of that fiduciary responsibility. We infer that the Executive Board would not have done so, and therefore resolve the ambiguity in favor of implying the contingency provision into the votes on the 1974 salary. For an identical reason we resolve the ambiguity created by the differences between the June 17, 1975 and the June 22, 1975 [7] resolutions pertaining to Bender's 1975 salary (the latter containing the contingency, the former not) in favor of implying the contingency into the June 17, 1975 resolution.

Additionally, we find that the Executive Board meeting procedure utilized on the above occasions, whereby the Board met in bifurcated sessions of respectively four and three members each, constructively complied with Article XXV of the IBT Constitution, . . . . The purpose of that provision is obviously to ensure that not *fewer* than four of the seven members of the Executive Board would take actions binding the local. The bifurcated meeting structure did not contravene this purpose, since at the two meetings, held within a week or ten days of each other, the full complement of Executive Board members had the opportunity to vote on the identical resolutions.

We find—indeed it was conceded by all—that Local 1 never had enough money to pay Bender a full salary at any time between January, 1972 and July, 1975, the date of the GEB merger order.

461 F.Supp. at 970–71.

Bender claims that Local 107 owes him $40,801.37 in back salary.[8] Local 107 con-

---

7. The correct dates are June 17 and July 22, 1975. Plaintiff's Exhibit 1a.

8. The amount in controversy is derived as follows:

tends that these salary resolutions are not binding on Local 107 for these reasons: [9]

1. Local 1 Executive Board members violated their fiduciary duty by creating salary obligations in the absence of by-laws that delegated such authority and by threatening the solvency of Local 1.

2. The purported contracts between Local 1 and Bender were and are unenforceable because of their indefinite and retroactive character.

3. The purposed contracts were and are sham because they were enacted with knowledge of and on account of the impending merger.

■ Local 107 charges that Local 1's Executive Board violated its fiduciary duty under the Labor Management and Reporting Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 501(a):

> The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage,

invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder. . . .

Defendants are correct that § 501(a), rather than state law, governs officer compensation. Local 107 contends that Local 1's Executive Board violated § 501(a) by passing the salary resolutions because Local 1 had not adopted by-laws authorizing the Executive Board rather than the membership to approve officers' salaries.

Local 1 did not comply with two provisions of the IBT Constitution: Article XXII, § 1, which mandates local union by-laws [10] and Article XIV, § 2(a)(1), which mandates monthly general membership meetings.[11] Local 1 never adopted by-laws at any time during the period from May, 1971 (when Bender became Secretary-Treasurer and Executive Board member) until July, 1975 (when IBT ordered the merger). Neither did Local 1's Executive Board hold monthly membership meetings during this period. But Local 1's failure to enact by-laws and hold membership meetings does not render its salary resolutions void for breach of fiduciary duty.

After reviewing the record, we find, as did Judge Becker, that during the relevant

---

1972 $10,000.00
1973   10,000.00
1974   12,500.00
1975    8,301.37   ($15,000 pro-rated: $15,000 divided by 365
       $40,801.37                      days for the year =
                                       $41.09 per day. There
                                       are 202 days from Janua-
                                       ry 1 through July 21; 202
                                       days multiplied by $41.09
                                       per day = $8,301.37

9. In the present action, Local 107 admits it succeeds to the liabilities of Local 1 and, accordingly, restricts its arguments to questioning the existence and validity of the alleged contracts between Local 1 and Bender. It is interesting to note that, quite likely, some liabilities of Local 1 became binding on Local 107 through a rather circuitous route. Arguably, Local 115 assumed the pre-May, 1974 liabilities of Local 1 when Locals 1 and 115 were ordered to merge in May, 1974. Although this merger was never consummated, it was effectuated upon order of the GEB. Then, when Local 1 was ordered to merge with Local 107, these pre-May, 1974 liabilities succeeded from Local 115 to Local 107.

10. Article XXII, § 1 provides in pertinent part:

> Each Local Union shall adopt its own separate Bylaws which must comply, and not conflict, with the provisions of the International constitution. Said Bylaws shall designate as the principal executive officer the President, the Secretary-Treasurer or the Recording Secretary.

11. Article XIV, § 2(a)(1) provides in pertinent part:

> General membership meetings shall be held monthly at such place and time as shall be designated by the Local Union Executive Board subject to disapproval by the General Executive Board. The General Executive Board shall establish such conditions relative to the holding of meetings as in its judgment it deems advisable. Membership meetings may be suspended during any three (3) months between June and October by action of the membership at a meeting after reasonable notice of the intention to vote upon such motion.

time period, "the IBT accepted regular monthly per capita payments from the Executive Board on behalf of the Local, accepted and approved regular trustees' reports from the Executive Board of the Local, and in short treated Local 1's Executive Board as a bona fide regularly-constituted organization that was empowered to take actions on behalf of the membership of Local 1." 461 F.Supp. at 969. The IBT did not take any action regarding Local 1's non-compliance even after receiving a June, 1972 auditor's report expressly calling attention to Local 1's failure to enact by-laws. IBT did not view Local 1's non-compliance serious enough to warrant the International's intervention at any time between 1971 and 1975.

Furthermore, IBT provided no guidelines regarding the content of by-laws or the voting rights of members and imposed no specific procedural requirements for passing binding salary resolutions. Therefore, there is no assurance that if there were by-laws, they would have included procedures for salary resolutions. IBT's silence does not imply a lack of authority to set salaries; the IBT Constitution (Article XXII, § 3) expressly provides:

> Any reduction in salary during a term of elected office in a local union or subordinate body shall be made only on the basis of adverse change to financial condition as attested to by the General Secretary-Treasurer of the International Union.

This section allowing reduction in salary only under certain conditions implies that the local unions do have the authority to set officers' salaries otherwise.

This International's silence with respect to procedure for setting salaries distinguishes this case from those referred to in defendant's brief. Additionally, cases cited by defendant generally involved a union officer's dishonest attempt to avoid by-laws in an effort to obtain an unearned bonus. In contrast, Bender seeks payment for work actually rendered on behalf of Local 1.

*Local No. 92, International Assn. of Bridge, SRO Workers v. Norris,* 383 F.2d 735 (5th Cir.1967), was a derivative action by local union members against their officers. Their International Union Constitution (Article XXIV, ¶ 4) expressly provided:

> No office shall be made or abrogated, or salary for same be changed, without written notice, to be read at three consecutive meetings, at which final action shall be decided by a majority vote.

The court held that the officers had breached their fiduciary duty to the local union by increasing their expense accounts in violation of this express prohibition and adopting a resolution exempting their salaries from the necessity of membership authorization. *McCabe v. International Brotherhood of Electrical Workers Local No. 1377,* 415 F.2d 92 (6th Cir.1969), is similarly distinguishable. *McCabe* involved the dishonest attempt of union officers to increase their salaries by collecting double reimbursement for expenses in violation of a specific provision of the International Constitution; the court held this was a clear breach of trust.

Bender's circumstances also differ in another regard. Both *Norris* and *McCabe* were brought by union members and/or officers against other officers. In our case there is no evidence that any member of Local 1 objected to the salary resolutions. No member of Local 1 disputed that Bender worked diligently on behalf of Local 1 for many years; no member disputed that Bender was entitled to reasonable compensation; no member objected to the use of union money to pay salary obligations; and no member claimed that the Executive Board's salary resolutions were in any way improper.[12] In fact, following the merger order, the members agreed with Bender's resistance to it.[13] The Executive Board salary resolutions were not a breach of

---

**12.** Since the resolutions were stated in the Minutes, there is no evidence of any covert behavior on the part of the Executive Board.

**13.** *See infra* at p. 22.

fiduciary duty to the membership of Local 1.

■ Defendant next contends that the retroactive, contingent and vague character of the salary resolutions makes them unenforceable.[14] The resolutions are not unenforceable because they are retroactive. In 1971, when Bender first became Secretary-Treasurer and Executive Board member, he worked for a salary of $200 per week. When Local 1 lacked the funds to pay his salary, Bender ceased receiving a paycheck but he did not waive compensation or agree to serve the union as a volunteer. Rather, Bender and the Executive Board had an implied contract, whereby Bender would recover the reasonable value of his services to Local 1 when Local 1 could afford his wages. The salary resolutions only confirmed an existing obligation.

■ But even if a new obligation were created by the salary resolutions, the same result would obtain. Bender's past services to Local 1 were good and sufficient consideration for the Executive Board's resolutions. It has long been the common law that "past services rendered may give rise to a moral obligation which is a sufficient consideration to support a promise to pay therefor." *In re Pohl's Estate,* 136 Pa.Super. 91, 92, 7 A.2d 14, 15 (1939). As was stated in *Sutch's Estate,* 201 Pa. 305, 314, 50 A. 943, 945 (1902), "[h]e was not legally bound to pay them anything, but if he chose to consider that he in conscience owed them, the moral debt was a good consideration for the legal promise expressed in the [promissory] notes."

■ The contract to pay Bender's salary was not invalidated because on the Labor Organization Annual Report Form LM–3, in response to the query "total debts," Bender answered "none." Local 1's assets were so small that the likelihood of paying Bender was correspondingly remote. The intention of the contracting parties was that Bender's salary would be paid only when and if Local 1 had sufficient assets; since Local 1 would pay only "when and if" it had the funds, there was the distinct possibility that Bender's work would never be compensated. But the fact that the condition precedent which would trigger salary payment might not occur does not invalidate the contract.

■ The contracts were also sufficiently definite. The court agrees that "for a contract to be enforceable it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties," *Soar v. National Football League Players Assn.,* 550 F.2d 1287, 1289–90 (1st Cir.1977) (applying Pennsylvania law). This condition has been met. As defendant correctly notes, for purposes of construction, the issues are the relevant intent of the contracting parties and definiteness of Local 1's promises at the time they were made. Restatement 2d of Contracts § 201(1). Thus, seeming uncertainties in the words of a contract may frequently be made clear by looking to the intent of the bargaining parties.

While the "when and if" language of the resolutions is admittedly vague to an outsider, the members of Local 1's Executive Board were all intimately familiar with Local 1's financial status. Bender himself was Treasurer. With the knowledge of the Executive Board, Bender took only small salary payments in 1975 and 1977. Both he and the Executive Board shared an understanding of the salary resolutions that was consistent with the International Constitution's requirement that local unions could not take actions impairing their solvency. Had Bender sued for salary while Local 1 was still in existence, the court would have had to ascertain the exact nature of the parties' intentions—*i.e.,* which outstanding debts had priority, how much in liquid assets had to be available after salary payments, and so on. But since that situation did not occur, it is suffi-

---

**14.** The resolutions were designed to operate retroactively for 1972, 1973, January and February, 1974, and January through June, 1975.

cient that the parties' observable behavior indicated a shared common meaning.

Currently, we must determine whether Local 107 can afford Bender's salary. In 1978, when the case was first tried, Local 107 submitted the following financial report for the period ending February, 1978:

### ASSETS

| | |
|---|---|
| Cash in Bank | $  51,387.76 |
| Cash in savings account | 546.55 |
| Savings bond | 520.00 |
| Land | 90,798.14 |
| Building | 89,206.91 |
| Furniture and fixtures | 49,871.23 |
| Total Assets | 282,330.59 |

### LIABILITIES

| | |
|---|---|
| Loan balance to International | 90,000.00 |
| Accounts payable | 78,531.64 |
| Total Liabilities | 168,531.64 |
| Total Net Assets | $ 113,798.95 |

461 F.Supp. at 973.

As Judge Becker found,

The largest items of expense for each month (after the per capita tax paid to the International) were salaries for the officers and business agents of Local 107. We credit the testimony of Kenneth Moore, Secretary-Treasurer of Local 107, that there are ten full-time officers and business agents currently on the payroll, each earning approximately $35,000 per year. This converts into a figure of approximately $27,500 per month for all ten.

*Id.*

Judge Becker then held:

[W]e think plaintiff Bender met his burden of establishing a *prima facie* case that Local 107 has sufficient net assets and cash flow to pay a $33,000 [15] debt. If there was any reason why it could not, defendant Local 107 did not come forward with it. Indeed, even under a more stringent test, we believe that Local 107 is in a sufficient financial position to pay. We conclude, therefore, that the condition precedent has been satisfied, and that the contingent salary obligation has

become a liability presently due and owing, payable by Local 107.

461 F.Supp. at 983–84. Local 107 has not claimed it is in poorer financial shape now.

■ Local 107's final argument is that the contracts were a sham because Local 1's Executive Board enacted the resolutions only when they had knowledge of the impending merger. The record shows the following sequence of events:

July 18, 1973 GEB of IBT voted to merge Local 1 into an appropriate local union.

March 4 and 14, 1974 First salary resolution.

April, 1974 Bender and Executive Board first learned of possible merger.

May, 1974 Bender and Executive Board learned that IBT intended to merge Local 1 into Local 115.

June 18, 1974 Bender and Local 1 filed suit to enjoin proposed merger.

December 31, 1974 Lawsuit dismissed.

January—June, 1975 Bender and Local 115 repeatedly requested cancellation of order to merge.

June 17, 1975 Philadelphia branch of Executive Board voted 1975 salary resolution.

July 8, 1975 GEB substituted Local 107 for Local 115 in merger order.

July 16, 1975 Fitzsimmons (President of IBT) wrote to Bender informing him of decision.

July 21, 1975 Officials demanded Bender hand over property of Local 1.

July 22, 1975 New York branch of Executive Board voted 1975 salary resolution.

Though defendant has not proved that Bender knew of a possible merger prior to April, 1974, Bender and Local 1 have not convinced the court that they had not heard rumors regarding the possible merger of their union. While Judge Becker is correct that rumors are not legally sufficient notice of a merger, it strains credibility to believe that Local 1's Executive Board was not influenced by the possibility of an order

---

**15.** The amount of $33,000 (or more precisely $33,209.69) is used as the relevant figure since Judge Becker set off the $7,591 Bender had previously taken as salary from the $40,801.37 owed.

to merge. In 1974 the Executive Board knew that some merger of Local 1 was being considered by GEB. By the time of the 1975 salary resolutions, the Executive Board of Local 1 was in the midst of an intense, protracted struggle to avoid merger with Local 107.

However, knowledge of a merger order does not render the salary resolutions sham. The Local 1 Executive Board believed it could successfully resist merger. When the 1974 salary resolution was passed, Local 1 had not yet been assigned a merging partner. The GEB was exploring possible mergers of a number of small local unions—Local 1 could reasonably hope to be among those spared. The Executive Board also knew it planned legal action if necessary to oppose any merger order. Locals 1 and 115 both opposed the first merger order and that merger was never consummated. The 1975 salary resolution was passed at the time the IBT amended its merger order to replace Local 115 with Local 107. Bender and the Executive Board planned to fight this merger also.

Even if Bender and the other Executive Board members did not believe they would be able to forestall a merger permanently, the salary resolutions were not sham. The purpose of the Executive Board resolutions were to ensure that Bender, a non-contractual employee, was legally entitled to compensation for his past services to Local 1. Any union absorbing Local 1 would absorb a viable and functioning union in large part due to Bender's unflagging and much appreciated efforts. The Executive Board did not bind a successor union to employ Bender nor did it require a successor union to pay a severance fee.[16]

*Period II: Local 107's Counterclaim*

In its counterclaim, Local 107 seeks $17,923.48 spent by Bender following the July 21, 1975 merger. Local 107 claims this money succeeded to it on the effective date of merger. As of July 21, 1975, Bender was told he would not be employed by Local 107 and was ordered to turn over all

of Local 1's property, including its cash. However, Bender refused to accede and continued to hold himself out as chief executive officer of Local 1 and to spend union dues money on its behalf.

The evidence supports Bender's argument that the Local 1 membership vehemently opposed merger, approved Bender's opposition efforts, and desired Bender's continuing services in collective bargaining negotiations. Few Local 1 members sent dues checkoff forms for Local 107, and questions arose regarding representation of Local 1 members which necessitated NLRB elections at Underwriters Adjusting Company and State Farm Mutual Automobile Insurance Company. *Underwriters Adjusting Co. and Local 107*, 227 N.L.R.B. No. 66, 1976–77 CCH NLRB ¶ 17,670 (1976); *State Farm and Local 1 and Local 107*, 225 N.L.R.B. No. 135, 1976–77 CCH NLRB ¶ 17,241 (1976).

Nevertheless, Bender's actions directly violated IBT written directives delivered July 21, 1975 and Local 107 President Bottone's letters of September 9 and 17, 1975. Representation rights of Local 1 members were not violated because they would be able to participate in the affairs of their new union, Local 107, although with considerably diluted voting power. A court may not intervene in internal union affairs unless a union constitution or by-laws deprive union members of rights guaranteed by the LMRDA. Therefore, this court may not set aside the merger order nor require the merged Local to finance Bender's rebellious activities.

The circumstances here are similar to those in *Zawada v. Pennsylvania System Board of Adjustment*, 392 Pa. 207, 140 A.2d 335 (1958). In *Zawada*, an international labor union revoked the charters of several locals and notified Zawada that he was terminated as a District Chairman. Zawada responded by filing suit. During the course of litigation, counsel agreed that the elected local officials could continue to perform their duties until the Court's final

---

**16.** The Executive Board's action may be contrasted with corporate "golden parachute" clauses. The latter, which provide for severance payments, may be unenforceable if enacted with notice of an impending tender offer or during a hostile takeover battle.

disposition of the charter forfeiture litigation. Subsequently, Zawada (through his wife and assignee) sought to recover compensation for his services.

The Pennsylvania Supreme Court found Zawada not entitled to compensation because his "services were thrust upon the appellee by the court order restraining the appellee from interfering with Zawada's functions and were, therefore, not voluntarily accepted by the appellee." 392 Pa. at 216, 140 A.2d at 339. Similarly, in the case at bar, Bender's services and expenditures on behalf of Local 1 occurred in spite of Local 107's strong opposition and the Pennsylvania Court's reasoning is persuasive. In a passage reminiscent of Bender and Local 1, that Court wrote:

> The bitterness and strife within this international labor union over the last several years has been intense and we cannot help but note Zawada's deep involvement throughout every aspect of the dispute. Zawada undoubtedly rendered services to the Brotherhood but, with the exception of a small amount of work with regard to a lodge not a party to the dispute but directly traceable to the chaos resulting from the division of authority, those services were forced upon the Brotherhood against its wishes and are of questionable worth. Nor can we disregard the fact that the Brotherhood was caused great expense in having to furnish one of its officers as Zawada's successor, in having to furnish that successor with a staff of assistants and in being forced to suffer through a period of divided authority in its government which caused needless duplication of effort, chaos and loss of prestige. The record clearly shows that Zawada, while occupying his judicially protected office,

was actively engaged in activities detrimental to the authority of the union. To allow Zawada's assignee to recover the value of the services he forced upon the appellee would frustrate the whole purpose of the law of restitution. Cf: *Gerson v. Philadelphia*, 342 Pa. 552, 555, 20 A.2d 283.

392 Pa. at 220, 140 A.2d at 341.

Though Bender could not legitimately represent IBT's Local 1 after June 21, 1975, we recognize that Bender was the preferred spokesman for many Local 1 members.[17] These workers had a right not to join Local 107 but to join Bender in a "new Local 1," an association unaffiliated with the IBT. Bender could seek recovery from members of a new Local 1 for expenses incurred in maintaining the new association.[18] But Local 107 is not responsible for the cost of maintaining an unaffiliated union.

Judgment on the counterclaim will be entered in favor of Local 107. After reviewing Exhibit C, consisting of copies of checks written on Local 1's account from 1976–78 and signed by Bender and stipulated to as authentic by the parties, we award Local 107 $15,837.73 on its counterclaim and offset this amount from Bender's salary award. This represents the total of post-merger checks written for all expenses, including salary, other than IBT dues and federal and state taxes.[19]

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties.

2. This court has jurisdiction over the subject matter under 28 U.S.C. § 1332. Bender, who never joined Local 107, was and is a citizen of New York. Local 107

---

17. *See supra* at p. 22.

18. Any such action would, at least in part, be barred by the statute of limitations. Also, any dues paid by Local 1 members after July, 1975 intended to support a new labor association headed by Bender are not the property of Local 107. However, since Bender has not proffered any evidence of such payments, we assume there were none and do not allocate Local 1 funds between Local 107 and a "new Local 1." *See Local Union No. 1075 v. United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, et al.*, 716 F.2d 182 (3d Cir.1983).

19. Since payments made to the Internal Revenue Service and other taxing authorities were due by law, Local 107 is not entitled to have them offset against Bender's salary award. Interest on the amounts awarded and set off shall accrue from this date of judgment. 42 Pa.C.S.A. § 8101.

had no active members in New York in 1980, when this action was commenced.

3. Upon merger, Local 107 assumed all contractual obligations of Local 1, including $40,801.37 in salary owed to Bender for his services from January 1, 1972 through July 21, 1975.

4. Following merger, Bender was not entitled to expend any funds of Local 1.

5. Judgment in favor of Bender for $40,801.37 will be entered on the claim.

6. Judgment in favor of Local 107 for $15,837.73 will be entered on the counterclaim and offset against Local 107's liability.